UNITED STATES, Appellee,

v.

Specialist Four Leroy COOPER, SSN
437–68–0110, United States
Army, Appellant.

CM 436278.

U. S. Army Court of Military Review.

7 Aug. 1978.

Captain Willard E. Nyman, III, JAGC, argued the cause for appellant. With him on the brief were Colonel Robert B. Clarke, JAGC, and Captain Larry D. Anderson, JAGC.

Captain Stephen D. Smith, JAGC, argued the cause for appellee. With him on the brief were Colonel Thomas H. Davis, JAGC, Lieutenant Colonel R. R. Boller, JAGC, and Captain Lee S. Schinasi, JAGC.

Before JONES, MITCHELL and De-FORD, Appellate Military Judges.

## OPINION OF THE COURT AND ACTION ON PETITION FOR NEW TRIAL

MITCHELL, Judge:

Appellant was tried by general court-martial for the offense of attempted rape in violation of Article 80, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 880. Contrary to his plea he was convicted and sentenced to a dishonorable discharge, total forfeitures, confinement at hard labor for twenty years, and reduction to the lowest enlisted grade. The convening authority reduced the period of confinement at hard labor to three years but approved the remainder of the sentence.

After trial, but before the convening authority took his action on the sentence, a special 39(a) session was convened to attempt to clear up certain allegations involving improper conduct on the part of the government prosecutors.[1] The military judge who presided at the original trial also presided at the special hearing. He made extensive special findings, basically stating that the questioned behavior of the prosecutor and his assistant was justified under the then existing circumstances and was not unethical. He justified their behavior on certain pretrial acts of the defense staff which he found to be unacceptable, but not unethical.

On 21 October 1977, three and one-half months after the convening authority's final action and two months after the case had been referred to this Court for review in accordance with Article 66, UCMJ, the appellant petitioned The Judge Advocate General of the Army for a new trial on the grounds of newly discovered evidence and fraud on the court. Since the accused's appeal was already pending before this Court the petition was referred to us for action in accordance with Article 73, UCMJ.

Appellate defense counsel have filed exhaustive and scholarly briefs in support of the petition for a new trial and assignments of error. Government appellate counsel have filed equally commendable briefs in reply.

In order to understand the respective theories of the antithetic appellate arguments, it is necessary to trace in some detail the piquantly competitive pretrial activities and

---

1. This post-trial hearing was apparently instigated by an ethics complaint against Captain Porter, the assistant trial counsel, by appellant's newly acquired defense counsel, Captain Dicharry, and by a letter to the convening authority from appellant. Captain Henderson, the trial counsel, was later drawn into the ethics controversy.

trial tactics of certain members of the defense staff and the two government prosecutors.

Appellant Cooper and his co-accused Castillo were charged with attempted rape of Fraulein Baron, a German national, in Munich, Germany. Cooper's trial defense counsel was Captain Argue. Castillo was defended in a separate trial, held two days after appellant's conviction, by Captain Ivey. More than a month prior to either trial, Captain Ivey instructed his office investigator, Specialist Harviel, to conduct a covert investigation of Baron's place of employment, the Madam Bar in Munich. Captain Ivey believed that the victim was either a prostitute herself, worked in a place frequented by prostitutes, or worked where "unusual" activity took place. He instructed Specialist Harviel and Frau Prudehl, a civilian legal clerk in his office, to go to Munich and find out "what went on in the bar."[2] It was decided by Captain Ivey that another enlisted man, Specialist Arpoika, not a member of the office staff but one who spoke German, would go along to assist in the venture. On 15 February 1977, 31 days before Cooper's trial, Prudehl, Harviel and Arpoika went to Munich to conduct the background investigation. The staff first attempted to determine if the victim spoke English by going to her apartment door and attempting to converse with her. They determined that her understanding of English was minimal at best. They next directed their attention to her place of employment, the Madam Bar.

Once inside the bar, Arpoika separated from the other two with instructions to gather the desired information concerning the establishment and the activities of its personnel, including Baron. He seated himself at the bar and asked the manager if Baron would be willing to go with him into an adjacent curtained-off booth and if she had ever done so in the past. Arpoika recalled at the post-trial hearing that he did not ask if Baron was available for sexual relations "in those terms." Following the foregoing conversation with the manager, during which little if any information was gained, Harviel called to Arpoika in English and they departed. This concluded their covert investigation.

Fraulein Baron, the alleged victim, who was working at the bar, recognized Frau Prudehl,[3] realized that the persons from Captain Ivey's office were in concert and was convinced that she (Baron) had been solicited for sexual relations. She reported this to the Army Criminal Investigation Detachment (CID) in Munich the following day. She told the agent that she had recognized Frau Prudehl but mistakenly identified Harviel as Major Henderson, the Article 32 investigation officer. The CID agent reported the complaint to Captain Porter, the assistant trial counsel, who in turn checked with Major Henderson. Captain Porter then identified the participants and the purpose of their Madam Bar visit by talking with Frau Prudehl.

As a result of Baron's report, and his considered conclusion that no evidence detrimental to her character had been obtained, Captain Porter wrote a letter, dated 17 February 1977, concerning potential charges against Captain Ivey and Specialist Harviel stemming from their covert investigation of the victim. This letter was intended as a joke and a copy was placed in defense counsel's office mail box.[4] A

**2.** A tawdry printed "invitation" (Defense Exhibit F) announced that the Madam Bar was a "Striptease Cabaret" where "International Film" were shown and coyly suggested the opportunity of nude female viewing.

**3.** Prudehl had served as interpreter for her office at the Article 32 hearing where Baron had testified.

**4.** The "joke" letter referred to "an attached charge sheet" which charged Captain Ivey and Specialist Harviel with (a) conspiracy to commit solicitation, (b) conspiracy to commit adultery, (c) solicitation, (d) attempted adultery, (e) conduct of a nature to bring discredit upon the armed forces. It recommended that no action be taken against Specialist Arpoika in that he was merely a "pawn" of the defense counsel with "no will of his own." It suggested that ongoing discussions concerning Frau Prudehl were being conducted with the Civilian Personnel Officer.

second letter, which set forth the fact that the initial letter was a joke, was given to Captain Ivey's superior, Captain Schwender. Appellant's defense counsel, Captain Argue, was shown both letters on the day they were prepared. Captain Ivey, who was in Berlin at the time, was told that the letter was a joke when he returned about a week later. Both Specialist Harviel and Frau Prudehl were also informed that the letter was written in jest and was not to be taken seriously.

At trial, Specialists Harviel and Arpoika testified concerning the covert investigation but Frau Prudehl did not testify.

On 6 April 1977, a week following his conviction, appellant received a letter from Captain Dicharry, a Judge Advocate General Corps officer assigned to another organization in Vilsech, Germany. The letter advised appellant of certain alleged documented information concerning "possible misconduct by one of the prosecutors in your case," and suggested that possibly he (Dicharry) could help appellant on the appeal. As a result of this letter appellant terminated the services of his trial defense counsel, Captain Argue, and chose Captain Dicharry to handle his post-trial defense activity. Concurrent with his rebuttal to the SJA's post-trial review, Captain Dicharry filed an Article 38(c) brief in support of his request for a new trial.

The convening authority ordered the special post-trial 39(a) proceedings presided over by Colonel Schiesser, as discussed above. After reviewing Colonel Schiesser's special findings and following the recommendation of his staff judge advocate, the convening authority approved the findings and the sentence, except the confinement at hard labor which he reduced to three years. This corresponds exactly to the sentence given Castillo, appellant's co-accused, at a trial before a separate jury two days following appellant's conviction.

As so candidly suggested by defense counsel in their appellate brief, this Court is now faced with the task of attempting to straighten out a "family feud" that has turned a relatively simple court-martial into a deplorable muddle. Appellant places before us for resolution two assignments of error, (a) improper questioning and argument on the part of the trial counsel denied the appellant's right to a fair trial, and (b) the trial defense counsel failed to render appellant the assistance of a reasonably competent counsel.

I

Appellant contends that trial counsel's cross-examination of Specialists Harviel and Arpoika, defense witnesses, and his subsequent argument based thereon, was improper and denied appellant a fair trial. Specifically, Cooper alleges that the prosecutor introduced false evidence during cross-examination, unduly harassed and intimidated defense witnesses, and conducted impermissible final argument. Appellant reasons that, on the foregoing basis, he was denied a fair trial and due process. He complains that by improper cross-examination, Captain Henderson introduced into evidence certain aspects of the "joke letter" which he (Henderson) knew to be false. He pin-points the following question addressed to Harviel:

You never saw anything about you were going to be read charges or charges were going to be preferred against you?

The key word, appellant argues, is "saw" which could only refer to the "joke letter." [5] He maintains this question, with its implication of criminal conduct on the part of the witness, was used strictly to intimidate and humiliate not only the witness but the entire defense staff. He cites language from *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959):

First, it is established that a conviction obtained through the use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment (citations omitted) . . . It is of no consequence

5. Captain Henderson, at the post-trial session, acknowledged that the basis of his question was the "joke letter" and that he knew at the time of the question the letter was a joke.

that the falsehood bore upon the witness' credibility rather than directly upon defendant's guilt. A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth. . . . (citing *People v. Savvides*, 1 N.Y.2d 554, 154 N.Y.S.2d 885, 136 N.E.2d 853.

Appellant also claims that Captain Henderson violated the *American Bar Association Standards relating to the Prosecution Function*:

5.6(a) It is unprofessional conduct for a prosecutor knowingly to offer false evidence, whether by documents, tangible evidence, or the testimony of witnesses.

(b) It is unprofessional conduct for a prosecutor knowingly and for the purpose of bringing inadmissible matter to the attention of the judge or jury to offer inadmissible evidence, ask legally objectionable questions, or make other impermissible comments or arguments in the presence of the judge or jury.

Appellant's final protestation regarding the prosecution team stems from Captain Henderson's closing argument on sentence when he said:

. . . I wanted you to hear the lengths that the defense has gone to in this case to try and get something on this poor girl. Now when they sent these two specialists [Harviel and Arpoika] down there to try to come up with something, what do they come up with? They come up with her *blowing the whistle on them and calling the cops*, that's what they come up with (Emphasis supplied).

This, appellant asserts was a prejudicial overstatement unsupported by the record. He argues that Fraulein Baron's reporting

the cabaret incident to the authorities did not mean that she "called the cops" or "blew the whistle."

As mentioned earlier, this case was investigated and tried in a charged atmosphere created to a great extent by the already strained personal relationship between Captain Porter, assistant trial counsel and Captain Ivey, counsel for appellant's co-accused Castillo.

Central to the issue of appellant's claim of denial of a fair trial is the reasonable interpretation given to actions and events surrounding and stemming from the defense staff's investigation at the Madam Bar. Although the interpretations given to certain aspects of the drama vary sharply, we feel the trial itself, though not perfect, was not prejudicially affected.

■ First, it is clear that the defense staff suspected that Fraulein Baron's place of employment was associated in some way with the ancient profession of prostitution. Our reading of the record and examination of the defense exhibits describing the Madam Bar tend to support that distinct possibility.[6] Since the entire defense theory centered around the question of monetary-induced consent[7] by the alleged victim, it was proper, indeed incumbent, upon defense counsel to learn as much as possible about her sexual habits and reputation for harlotry. Proving the prosecutrix to be a prostitute would have been a major defense victory. Obviously the naiveté of the investigatory operation contributed substantially to its eventual futility.

■ We are convinced that trial counsel's characterization of Fraulein Baron's statements to the authorities as "calling the cops" and "blowing the whistle" was founded upon a reasonable analysis of the facts and that the statement was properly utilized by the prosecutor to enhance the com-

---

6. For 280 marks (approximately $115.00) a patron is given a bottle of champagne and assigned a young woman who accompanies him into a "separate" (curtained-off cubicle) where obscene movies are shown on the wall.

7. At trial, appellant testified that he picked up Fraulein Baron on the street, that she accepted $30.00 for sexual favors, and that he was surprised later when she resisted his advances. Appellant had not visited her at the bar.

plaining witness' credibility and character. It did not, in our view, constitute false evidence, nor was it utilized to harass or intimidate any defense witness or the defense staff. The prosecutor gratuitously profitted from the defense bungle. It was a legitimate government counter-attack on the defense tactic of impugning the character and morals of the victim. We find no impropriety in utilizing the statement and its origin to support Fraulein Baron's character after attack by the defense.

Remaining is the reference made by trial counsel during his questioning of Specialist Harviel to charges pending as a result of the investigation. Government counsel do not dispute that the concept of potential charges was a creation of Captain Porter, embodied in the so-called "joke" letter. They argue, however, that the mere reference to such fictitious charges does not mandate reversal of the findings and sentence. We agree.

■ Where it is claimed that the improper questions resulted in the denial of a fair trial (by the inferential introduction of false evidence), we must determine whether such action had a substantial influence on the verdict; in other words, the test is for prejudice. *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *United States v. Valencia*, 1 U.S.C.M.A. 415, 4 C.M.R. 7 (1952). Further, the test for prejudice under such circumstance appears to be objective. In *Napue*, the Supreme Court, quoting from the opinion in *People v. Savvides*, 1 N.Y.2d 554, 154 N.Y.S.2d 885, 136 N.E.2d 853 (1956), adopted the view that the subjective intent of the prosecutor is of little importance. *Napue v. Illinois, supra*, at 360 U.S. 269–270. *Accord, Giglio v. United States, supra*. The adoption of the objective test for prejudice is a reflection of the basic concern that the function of the prosecution is to insure truth, and to seek a conviction based on truth. *See Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935); *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935).

■ Our review of the testimony of Harviel and Arpoika convinces us that they presented no significant evidence relating to the character of Fraulein Baron. They were able to state only that unidentified girls in the Madam Bar would sit with customers who paid for drinks and that there were separate booths for that purpose. They presented no evidence that prostitution was ongoing, or that Fraulein Baron was so engaged. Their testimony in no way contradicted that of the victim who had testified earlier and who admitted on cross-examination the substance of Harviel's and Arpoika's testimony. Therefore, a total impeachment of their testimony by the prosecutor's improper question would have been inconsequential. The lack of prejudice is obvious.

For still another reason we find that appellant was not prejudiced. The evidence of appellant's guilt is clear and convincing beyond a reasonable doubt. Two witnesses in an upstairs apartment heard screams and noises coming from a car parked in a nearby parking lot. When the police approached the car, they heard screams for help. Appellant's trousers were down below his knees. The distraught victim was examined and observed to have swelling, lacerations and bruises. Appellant was bleeding from his hand where she had bitten him. The vivid details of the attack were instantaneously supplied by the victim. We, therefore, find the evidence of appellant's guilt to be compelling with no perceptible risk that the trial counsel's complained of questioning or argument had any effect on the trial's outcome. *United States v. Coades*, 549 F.2d 1303, 1360 (9th Cir. 1977); *United States v. Carlson*, 547 F.2d 1346, 1362 (8th Cir. 1976); *United States v. Wollery*, 5 M.J. 31 (C.M.A. 1978); *United States v. Bell*, 3 M.J. 1010 (A.C.M.R. 1977).

II

Appellant alleges that his trial defense counsel was ineffective by failing to object to improper questioning and argument by trial counsel. In the same context he con-

tends that his counsel's failure to move for a mistrial constituted ineffective assistance.

We are aided by the testimony of the original trial defense counsel given at the post-trial hearing. Though it is self-serving, we are impressed by the reasoning of Captain Argue explaining his trial tactics. He was convinced at the time of its presentation that the testimony of Harviel and Arpoika had failed to present any competent evidence which might have discredited the victim. He perceived that the court members were disinterested in their testimony and in turn any redirect examination of them would have had the bad effect of engendering additional sympathy for the victim and her obvious humiliation.

 Counsel should not be judged with the benefit of hindsight. *United States v. Rivas*, 3 M.J. 282 (C.M.A. 1977); *Gaines v. Hopper*, 575 F.2d 1147 (5th Cir. 1978); *United States v. Smith*, 179 U.S.App.D.C. 162, 551 F.2d 348 (1976); *United States v. Grummel*, 542 F.2d 789 (9th Cir. 1976); *McMann v. Richardson*, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970). Counsel's tactical decision, which was founded on what he perceived to be the best interest of his client at the time, should not be judged by second guessing. Should errorless participation be the benchmark no representation by mortal lawyers would pass muster. Additionally, in light of the convincing evidence of appellant's guilt, and the minimal probative value of Harviel's and Arpoika's testimony, any omission or mistake committed by failing to object was not prejudicial to appellant. *Jones v. Taylor*, 547 F.2d 808 (4th Cir. 1977); *Harshaw v. United States*, 542 F.2d 455 (8th Cir. 1976). We find that any error by counsel was harmless beyond a reasonable doubt. *United States v. Ward*, 1 M.J. 176 (C.M.A. 1975); *United States v. Moore*, 1 M.J. 390 (C.M.A. 1976).

 Captain Argue told appellant, after his conviction, that it was his opinion an Article 38(c) brief at the command level was a waste of time—that neither the staff judge advocate nor the convening authority read it; that the SJA review was just a rubber stamp procedure; and that there were no grounds for a new trial. Appellant now asserts that this advice constituted an abandonment of his interests.

Following the special 39(a) session, Captain Dicharry, appellant's newly acquired defense counsel, was directed by the military judge to prepare an Article 38(c) brief and a petition for a new trial due to what the judge said was the possibility that appellant could have been misled by Captain Argue's advice. They were prepared and subsequently the SJA recommended to the convening authority that he reduce the confinement time from 20 years to 3 years. This clemency recommendation was followed by the convening authority. Any misadvice on the part of Captain Argue was mooted by the submission of the brief by new defense counsel and by the action of the convening authority.

### III

 Petitioner Cooper, proffering the contents of an ethics complaint and the testimony taken at the post-trial hearing, petitions for a new trial. He claims that newly discovered evidence arose at the hearing; and that fraud was perpetrated upon the court in that the assistant trial counsel questioned the Article 32 officer about his possible involvement at the Madam Bar prior to the Article 32 investigation, and that trial counsel's cross examination and argument were based on the so-called "joke letter." He further alleges that Captain Porter, the assistant trial counsel continually harassed and threatened defense personnel in order to hinder defense activities.

Our reading of the record convinces us that this petition reveals no credible evidence which could reasonably be considered either newly discovered evidence or show that a fraud was perpetrated upon the court. More than 500 pages are devoted to the post-trial hearing and special findings of the military judge. They are replete with an almost endless array of charges and counter-charges, insinuations and innuendoes of adversary counsel involved in both

the case at bar and the companion case of the co-accused, Castillo. It appears to us that much of the chronology of mutual displeasure had little relationship to the litigation under review. Figuratively, the Gingham Dog and the Calico Cat had their day in court.[8]

We are convinced that even assuming that some of the evidence came to light for the first time during the post-trial hearing, it does not appear that an injustice has resulted from the findings or the sentence and that a new trial would probably produce a substantially more favorable result to the accused. Article 73, UCMJ; paragraph 109, Manual for Courts-Martial, United States, 1969 (Revised edition). Accordingly, the Petition for a New Trial is denied.

The findings of guilty and the sentence are affirmed.

Senior Judge JONES and Judge DeFORD concur.

---

8. The gingham dog went "Bow-wow-wow!" and the calico cat replied "Mee-ow". The air was littered, an hour or so, with bits of ging- ham and calico. *The Duel*, Stanza 2, by Eugene Field (1850–1895).