UNITED STATES, Appellee,

v.

Jeffrey S. COOK, Staff Sergeant,
U.S. Air Force, Appellant.

No. 96–1164.
Crim.App. No. 31624.

U.S. Court of Appeals for
the Armed Forces.

Argued Nov. 4, 1997.

Decided Aug. 7, 1998.

For Appellant: *Major Kevin P. Koehler* (argued); *Lieutenant Colonel Kim L. Sheffield* (on brief); *Colonel David W. Madsen, Colonel Douglas H. Kohrt,* and *Colonel Jay L. Cohen.*

For Appellee: *Captain Mitchel Neurock* (argued); *Colonel Theodore J. Fink, Lieutenant Colonel Michael J. Breslin,* and *Captain Deborah M. Carr* (on brief); *Colonel Brenda J. Hollis.*

### Opinion

GIERKE, Judge:

A general court-martial composed of officers convicted appellant, contrary to his pleas, of rape, forcible sodomy, unlawful entry, and adultery, in violation of Articles 120, 125, and 134, Uniform Code of Military Justice, 10 USC §§ 920, 925, and 934, respectively. The adjudged and approved sentence provides for a dishonorable discharge, confinement for 15 years, total forfeitures, and reduction to the lowest enlisted grade. The Court of Criminal Appeals affirmed the findings and sentence in an unpublished opinion.

Our Court granted review of the following issue:

WHETHER THE MILITARY JUDGE ERRED BY ALLOWING SERGEANT PIZZULO TO TESTIFY THAT APPELLANT REMAINED SILENT WHEN SERGEANT PIZZULO ASKED HIM WHETHER HE COMMITTED THE ACTS, AND, IF SO, WHETHER ERRONEOUS ADMISSION OF THIS EVIDENCE WAS PROPERLY TESTED BY THE AIR FORCE COURT OF CRIMINAL APPEALS UNDER A HARMLESS–ERROR STANDARD.[1]

We hold that the military judge erred, and that the error was prejudicial.

### Factual Background

It was uncontested that appellant and Staff Sergeant (SSgt) H had sexual intercourse during the early morning of July 17, 1994. SSgt H testified that appellant broke into her house and then raped and forcibly sodomized her. The defense theory was that appellant and SSgt H had consensual sexual intercourse and that on the following morning, at the suggestion of a friend, SSgt H decided to accuse appellant of raping and forcibly sodomizing her. The defense presented no evidence but instead concentrated on attacking the testimony of SSgt H as improbable and suggesting that she was not credible because of her history of personality disorders.

At the time of trial, SSgt H was a 35–year–old single mother of two boys, aged 8 and 3. She lived on-base in military quarters. She testified that, on the evening of July 16, 1994, she and several female friends went to the noncommissioned officers' club. At the club, appellant came to their table and introduced himself. Even though appellant had a cast on his lower leg, he asked SSgt H to dance, and they danced one dance. While they were dancing, appellant talked about his family and his marital problems. SSgt H testified that, toward the end of the dance, appellant told her that "he would like to dance with [her] more, but, if he did, he'd end up f——g [her] on the dance floor," and then he bit her on the neck. She pushed away from him, returned to her table, and told her friend, CL, what he had done. Later CL danced with appellant, and he also bit her on the neck.

SSgt H testified that, as she and CL were leaving the club, appellant approached and said, "What would you do if I showed up on your doorstep at 3:00 o'clock in the morning?" She replied, "Sleep right through it, so don't bother." Then she said, "But, if you want to talk, you can come over tomorrow afternoon, after church, and we'll sit outside, and—you know—we can talk." Asked why she invited appellant, she testified, "Because he was complaining, most of the night, about his marriage problems, so I thought he wanted to talk about it." As SSgt H and CL left, appellant gave a "quick kiss" on the lips to each of them.

---

1. We also granted review of the issue whether rape is multiplicious with adultery. This issue was resolved against appellant in *United States v. Hill,* 48 MJ 352 (1997).

SSgt H testified that she was awakened during the night by someone knocking on her door. She saw appellant through a window and waited to see if he would continue knocking, but when she saw him walking away, she went back to bed. While in bed, she heard noises in the house and thought it was her younger son. As she was getting out of bed to investigate, appellant walked into her bedroom. She testified that she screamed and covered herself, and that appellant said, "Shhh. It's Jeff." She asked appellant, "What are you doing here?" and he said that she had invited him.

SSgt H testified that she put on a robe and told appellant, "[T]hat's not what I said, but if you really want to talk that much, talk." Appellant started talking about his wife and shouting that he could not afford a divorce. SSgt H cautioned him to be quiet so that he would not wake up her children.

SSgt H testified that, at that point, he began trying to touch her chest and she kept pushing him away and telling him to leave. Appellant pushed her onto the bed, removed her underpants, and performed oral sex on her. She kept saying, "Please don't do this to me." She testified that she was afraid that her boys would awaken and the older boy would try to protect her, not understanding what was happening.

SSgt H testified that appellant then unbuttoned his pants, put on a condom, and had intercourse with her. She continued to say, "Please don't do this to me." She testified that appellant threatened her with anal intercourse if she did not respond to him, and that he put his fingers in her anus. After a short time, appellant had sexual intercourse with her a second time and then grabbed her by the hair and pushed her face onto his penis and told her to "suck him." She kept saying, "This isn't going to work, it's done. Get the hell out of my house, it's done." Appellant agreed to stop. SSgt H walked downstairs with him, and appellant kissed her before walking out the door. The entire episode lasted about 2 hours.

The next morning, CL visited, and SSgt H described what had happened. CL said, "He raped you." CL testified that she and not SSgt H first used the word "rape."

SSgt H testified that she was reluctant to report the incident but agreed to talk to the Office of Special Investigations (OSI) if that would keep the incident off the police blotter. She was afraid that her older son would find out what had happened if the incident was on the police blotter.

SSgt H admitted on cross-examination that she had been diagnosed with "adjustment disorders" as early as 1983, and that she had been again diagnosed as having an "adjustment disorder" approximately 1 month before the trial. Defense counsel elicited that, in 1985, SSgt H had been diagnosed as "an essentially angry, sullen, irritable, and suspicious individual" who was "manipulative and argumentative ... overly sensitive to criticism, and frequently jumps to conclusions, based on inadequate data." In 1986 she was diagnosed as having "a mixed personality disorder, with histrionic and borderline features." In 1990 she was diagnosed as having "histrionic personality traits" and being "prone to exaggerations of emotions and behavior in her interpersonal relations."

During an Article 39(a) [2] session convened before Sgt Pizzulo testified, defense counsel lodged several objections to Sgt Pizzulo's testimony, including a specific objection to the purported admission by silence. Defense counsel asserted, "I don't think the Government can offer an admission by silence, after an individual has been advised of his right to remain silent and his right to counsel, and, in fact, Sergeant Cook had obtained counsel at that time." Without making findings of fact or reciting reasons, the military judge overruled the objection.

Sgt Pizzulo testified that appellant told him on the afternoon of July 17 that SSgt King had given him a ride to a house, that all the lights were out, and that he had gone inside the house and "had gotten lucky." While appellant, Sgt Pizzulo, and some acquaintances were watching television that evening, appellant answered a knock on the

2. Uniform Code of Military Justice, 10 USC § 839(a).

door and was apprehended by agents of the OSI on Sgt Pizzulo's front porch.

About a week later, appellant came to Sgt Pizzulo's house and asked if he had told anyone about what had happened. Appellant said, "[I]f you were a true friend, you wouldn't say anything."

Sgt Pizzulo testified that he asked appellant, "[W]hat'd you get charged for? Was it rape?" Appellant did not respond. Sgt Pizzulo asked, "Well, did you do it?" Again, appellant did not respond. The conversation changed to another subject, and appellant departed. On cross-examination Sgt Pizzulo conceded that appellant may not have responded to his questions because he had been advised by a defense counsel not to talk about it.

At the conclusion of the prosecution case, the defense rested without presenting any evidence. During argument on findings, trial counsel commented several times on appellant's failure to respond to Sgt Pizzulo's questions. He argued:

> [W]hat you don't say is more important than what you do say.... If he was falsely accused, wouldn't you expect him to say, "No, by God, I didn't do it. She's lying?" Isn't that what you expect from an innocent man? His silence in the face of a serious rape allegation speaks volumes about his guilty state of mind.

Finally, in rebuttal, trial counsel again argued:

> If he's not guilty, why would he stand silent, when Sergeant Pizzulo made the accusation? ... Why did he stand silent? Because he was evidencing his guilty state of mind.

The defense did not object to trial counsel's arguments.

The military judge made no specific reference to admissions by silence in his instructions, but his instructions on findings included the following:

> The accused has an absolute right to remain silent. You will not draw any inference adverse to the accused from the fact that he did not testify as a witness. The fact that the accused has not testified must be disregarded by you.

The Court of Criminal Appeals held that appellant's failure to respond to Sgt Pizzulo's questions was not relevant, but that the error in admitting the irrelevant evidence was not prejudicial.

Appellant now argues that the court below was correct in finding his silence irrelevant, but that the lower court erred in holding that the error was not prejudicial. Appellant argues that the purported admission by silence was a critical part of the Government's case, as evidenced by trial counsel's repeated references to his silence in his opening and rebuttal arguments on findings.

The Government asserts that appellant's admission by silence was relevant and admissible, citing *United States v. Pearson*, 6 MJ 953 (ACMR 1979), and *United States v. Cain*, 5 MJ 844 (ACMR 1978). The Government also argues that the court below, although incorrectly holding that the evidence was irrelevant, properly concluded that any error was not prejudicial.

*Discussion*

The concept of an admission by silence was expressly recognized in the Manual for Courts–Martial before the Military Rules of Evidence were promulgated. Both paragraph 140a, Manual for Courts–Martial, United States, 1951, and paragraph 140a(4), Manual, *supra*, 1969 (Revised edition), provided that when an accused was not in custody or under arrest or investigation, failure to deny an accusation under certain circumstances "may be regarded as incriminating evidence which is admissible." *See generally United States v. Armstrong*, 4 USCMA 248, 15 CMR 248 (1954).

The Military Rules of Evidence, Manual, *supra* (1995 ed.), do not expressly recognize admissions by silence but implicitly do so by stating when the inference drawn from silence may not be drawn. Mil.R.Evid. 304(h)(3) provides:

> A person's failure to deny an accusation of wrongdoing concerning an offense for which at the time of the alleged failure the person was under official investigation or was in confinement, arrest, or custody does

not support an inference of an admission of the truth of the accusation.

Mil.R.Evid. 304(h)(3) "is taken from Para. 140a(4) of the 1969 Manual," which described admissions by silence. Drafters' Analysis of Mil.R.Evid. 304(h)(3), Manual, *supra* at A22-13. Although no longer expressly recognized in the Military Rules of Evidence, admissions by silence continue to be recognized in both military and civilian federal practice. *See, e.g., United States v. Stanley*, 21 MJ 249, 250 (CMA 1986); *United States v. Giese*, 597 F.2d 1170, 1196 (9th Cir.1979).

It is uncontroverted that on July 17, 1994, the day after the alleged rape, appellant was apprehended at Sgt Pizzulo's residence, and the OSI began its investigation. Defense counsel's assertion that appellant had been advised of his rights and had retained counsel was not contested by the Government. In his cross-examination of Sgt Pizzulo, defense counsel suggested that appellant's silence might have been in accordance with advice of counsel.

■ The Court of Criminal Appeals held that Mil.R.Evid. 304(h)(3) did not preclude admission of Sgt Pizzulo's testimony about appellant's silence, because Sgt Pizzulo was not acting in any official capacity. We disagree with that court's narrow interpretation of Mil.R.Evid. 304(h)(3). The Drafters' Analysis indicates that the rule was taken from earlier Manual provisions describing admissions by silence.

■ We agree, however, with the lower court's conclusion that appellant's silence was not relevant. The gist of Mil.R.Evid. 304(h)(3) is that silence by an accused who is under investigation will not logically support an inference of guilt. Thus, appellant's silence after being apprehended, advised of his rights, and having obtained counsel was not relevant to the question of his guilt. Accordingly, we hold that the military judge erred by permitting the Government to introduce evidence of appellant's silence when asked by Sgt Pizzulo if he had raped SSgt H.

3. UCMJ, 10 USC § 831.

■ The error, however, was not of constitutional dimension. It was an evidentiary error involving admission of irrelevant and highly prejudicial evidence. *See* Mil.R.Evid. 402. Because Sgt Pizzulo was a friend, junior in grade to appellant, and not acting in a law enforcement capacity, Article 31[3] was not triggered. *See United States v. Duga*, 10 MJ 206 (CMA 1981). Appellant was not in custody and had not yet been charged. *See United States v. Miller*, 46 MJ 80 (1997). Trial counsel did not comment on appellant's failure to testify or present evidence at trial, and the military judge specifically instructed the members not to draw any adverse inference from appellant's failure to testify. Therefore, the Fifth Amendment was not implicated. *See United States v. Saint John*, 23 USCMA 20, 48 CMR 312 (1974).

■ In order to hold that a nonconstitutional error was harmless, we must be able to say, "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). The error must be evaluated, "not singled out and standing alone, but in relation to all else that happened." *Id.* at 764, 66 S.Ct. 1239.

■ We disagree with the court below that the erroneous admission of evidence of appellant's silence was harmless. While the evidence that sexual intercourse occurred was overwhelming, the evidence of rape, sodomy, and unlawful entry came solely from the testimony of SSgt H. Her testimony was vigorously attacked as improbable and unworthy of belief. The purported admission by silence directly pertained to the alleged rape.

The inadmissible evidence of appellant's silence was presented as an admission, one of the most damaging types of incriminating evidence. *See Arizona v. Fulminante*, 499 U.S. 279, 296, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), quoting Justice White's dissent in *Bruton v. United States*, 391 U.S. 123, 139–

40, 88 S.Ct. 1620, 20 L.Ed.2d 476 ("[T]he defendant's own confession is probably the most probative and damaging evidence that can be admitted against him."). Appellant's purported admissions were a significant piece of the prosecution case. Although trial counsel was careful not to comment on appellant's failure to testify or present evidence, trial counsel's repeated hammering on appellant's silence could not help but call attention to the absence of defense witnesses or testimony from appellant. There was no physical evidence or direct corroboration of rape, forcible sodomy, or unlawful entry. Trial counsel repeatedly argued that appellant would not have answered his friend's questions with silence if he was innocent. *See United States v. Riley,* 47 MJ 276, 280 (1997). On this record, we "cannot say, with fair assurance," that the military judge's error did not substantially affect the court members' decision to convict appellant. *Kotteakos, supra* at 764, 66 S.Ct. 1239.

### Decision

The decision of the United States Air Force Court of Criminal Appeals is reversed as to Charge I and its specification (rape), Charge II and its specification (sodomy), Charge III and its specification (unlawful entry), and the sentence. The findings of guilty thereon are set aside. The decision is affirmed with respect to specification 1 of Charge IV and Charge IV. The record of trial is returned to the Judge Advocate General of the Air Force. A rehearing may be ordered.

Judge EFFRON concurs.

SULLIVAN, Judge (concurring in the result):

The majority asserts that "the Fifth Amendment was not implicated" in this case.

48 MJ at 240. It is uncontroverted that, prior to the silence commented on by trial counsel, appellant was arrested by OSI, advised of his rights, and exercised his right to counsel. The dissent asserts that this is not a case "in which his silence was temporally or geographically related to an arrest and warnings." 48 MJ at 243. In my view, this is an open question which should be addressed. *See United States v. Ross,* 123 F.3d 1181, 1188 (9th Cir.1997)(case law does not delineate how long warnings required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), protect a defendant or at what point that protection evaporates).

In any event, I would hold that, even applying a lesser standard for assessing prejudice (*cf. United States v. Tenorio,* 69 F.3d 1103, 1106 (11th Cir.1995)), appellant's convictions must be reversed and a rehearing authorized.

CRAWFORD, Judge, with whom COX, Chief Judge, joins (dissenting):

For hundreds of years, individuals, in reacting to one another, have applied the principle that an innocent person would object when faced with a baseless accusation.[1] When, prior to trial,[2] a person remains silent or gives an ambiguous reply to an accusation, such evidence, called a tacit admission, may be admissible in the case-in-chief or for impeachment purposes. Likewise, evidence that a defendant attempted to silence a witness is admissible. *See* Mil.R.Evid. 404(b), Manual for Courts–Martial, United States (1995 ed.).

### FACTS

The afternoon following the alleged rape, appellant went to Sergeant (Sgt) David Piz-

---

1. An early exposition of the rule is the maxim of Pope Boniface VIII: "Qui tacet, consentire videtur," or "He who is silent shows agreement." 5 Pope Boniface VIII, Book of Decretals, ch. 12 § 43 (c. 1300).

2. In *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), the Supreme Court held that a prosecutor's comment on a state defendant's failure to testify was unconstitutional. That case overruled holdings in *Twining v.*

*New Jersey,* 211 U.S. 78, 29 S.Ct. 14, 53 L.Ed. 97 (1908) and *Adamson v. California,* 332 U.S. 46, 67 S.Ct. 1672, 91 L.Ed. 1903 (1947), which permitted comment on a state defendant's failure to take the stand and allowed the jury to consider it during their deliberations.

In *Carter v. Kentucky,* 450 U.S. 288, 101 S.Ct. 1112, 67 L.Ed.2d 241 (1981), the Supreme Court held that the trial judge must give a no-adverse-inference instruction upon request.

zulo's home. According to Sgt Pizzulo, appellant told him that after the club closed, appellant asked Sgt Lance King to drop him by a house where there was a party. Sgt Pizzulo testified as follows:

A: [Sgt Lance King] [d]rove [appellant] to the house. And [appellant] had told Lance that there was a party there. And Lance had noticed that the lights were—that all the lights were out.

And [appellant] said, "Well, the party must have moved. Just drop me off here." And so, Sergeant King dropped him off, and then I guess he went inside the house.

Q. What did he say about going inside the house?

A. He said he went inside the house, and that's when he had gotten lucky. I guess he had met a girl or something, and they had—that was her house.

Police arrested appellant at Sgt Pizzulo's house that afternoon. Appellant returned to Sgt Pizzulo's house about a week later. Sgt Pizzulo testified to the following:

A: [Appellant] asked me did I tell anybody about what happened that night before—

Q: Why did he ask you that?

A: because of something about his son—you know— asking questions about it. And I told him, "No, I haven't said anything to anybody about it." And I asked him—to tell the truth, I really didn't know what he got—you know—accused for—

Q: Did the accused say anything about your talking?

A: Yeah. He said, "Well, if you were a true friend, you wouldn't say anything."

A. I told him, "Well, I haven't said a word about it." And then I asked him—I said, "Well, what'd you get charged for?" I said, "Was it rape?" And then he didn't say anything. I said, "Well, did you do it?" And he didn't say anything after that, either.

Q: He never answered the question?

A: No, he didn't.

The majority notes that it was not until after another person mentioned the rape that the victim made a complaint against appellant. There are many reasons why women do not want to admit what happened.[3] Certainly, the victim could well have been embarrassed that appellant broke into her house at night, talked, and then committed forceful rape and sodomy on her.

## DISCUSSION

This case requires an examination of the hierarchy of the sources of rights in the military.[4] These include constitutional rights, which are superior to all other rights, and evidentiary rules.

### Fifth Amendment

The Fifth Amendment to the United States Constitution provides: "No person ... shall be compelled in any criminal case to be a witness against himself nor be deprived of life, liberty, or property, without due process of law[.]" In a criminal trial, the defendant has the right to remain silent in the face of the prosecution's evidence.[5] The factfinders should draw no negative inferences from this silence.[6] Nor can the prosecution comment upon the silence of the accused in face of these accusations.[7]

The federal courts allow an inference of guilt from the accused's silence where the accused is not in custody and there have been no rights warnings.[8]

---

3. *See* Berger, *Man's Trial, Woman's Tribulation: Rape Cases in the Courtroom*, 77 Colum.L.Rev. 1, 22–32 (1977).

4. *See, e.g., United States v. Lopez,* 35 MJ 35 (CMA 1992).

5. *Griffin,* 380 U.S. at 613–14, 85 S.Ct. 1229.

6. *Carter,* 450 U.S. at 301, 101 S.Ct. 1112.

7. *Griffin,* 380 U.S. at 615, 85 S.Ct. 1229.

8. *See United States v. Aponte,* 31 F.3d 86, 87 (2d Cir.1994); *United States v. Schaff,* 948 F.2d 501, 505 (9th Cir.1991); *United States v. Andrus,* 775 F.2d 825, 839–40 (7th Cir.1985); *United States v. Moore,* 522 F.2d 1068, 1075 (9th Cir.1975); *see also* 8 Wigmore, *Evidence* § 2250 at 267–70 (McNaughton rev.1961).

Appellant's case is not one in which his silence was temporally or geographically related to an arrest and warnings.[9] Nor was this a case in which the court admitted evidence of appellant's silence when law enforcement officials made an accusation immediately after appellant's arrest.[10] Rather, in this case, appellant told his friend to keep quiet and did not respond to the queries of that friend, a subordinate. I conclude that the Fifth Amendment does not preclude admission of this evidence.

### Evidentiary Rules

Mil.R.Evid. 304(h)(3) provides:

A person's failure to deny an accusation of wrongdoing concerning an offense for which at the time of the alleged failure the person was under official investigation or was in confinement, arrest, or custody does not support an inference of an admission of the truth of the accusation.[[11]]

History does not support the majority's interpretation of Mil.R.Evid. 304(h)(3). The Manual indicates this rule is taken from paragraph 140a(4) of the Manual for Courts-Martial, United States, 1969 (Revised ed.), which in turn was taken from the Manual for Courts-Martial, United States, 1951, with minor changes. But the rule even predates the 1951 Manual.

The Manual Rules, starting with the 1951 Manual, were designed to set forth "rules of common application in the Federal courts." Para. 140(a), Legal and Legislative Basis, 1951, Manual, *supra.*

Paragraph 127a, Manual for Courts-Martial, U.S. Air Forces, 1949, contains this language: "Courts should bear in mind that mere silence on the part of an accused when questioned as to his supposed offense is not to be treated as a confession or admission." Virtually identical language was contained in paragraph 114a of the Manual for Courts-Martial, U.S. Army, 1928, and paragraph 225(d) of the Manual for Courts-Martial, U.S. Army, 1921, with no citation of authority for any of the rules. Each of these Manuals contained a comment about applying the rules commonly applied in the federal courts. *See* para. 124, 1949 Manual, *supra;* para. 111, 1928 Manual, *supra;* para. 199, 1921 Manual, *supra.* Interestingly, Colonel Winthrop stated, "Confessions made by private soldiers to officers or noncommissioned officers, though not shown to have been made under the influence of promise or threat, should yet, in view of the military relations of the parties, be received with caution.... Mere silence on the part of an accused, when questioned as to his supposed offense, is not to be treated as a confession." W. Winthrop, *A Digest of Opinions of the Judge Advocate General of the Army,* para. 13 at 398 (1895). Winthrop (398 at n.2) cites for his authority *Campbell v. State,* 55 Ala. 80 (1876).

In *Campbell,* Thompson was the defendant's neighbor and noticed some missing ears of corn from his field. Thompson traced some unusually shaped footsteps to Campbell's field and saw some corn drying in the sun near Campbell's home. Thompson accused Campbell of stealing the corn but the defendant remained silent. *Id.* at 81–82. At trial, the judge admitted Thompson's testimony as to this exchange and instructed the jury that "the fact that the person who is charged with the commission of a crime says nothing, but remains silent, is a circumstance to which the jury may look as a *confession of guilt." Id.* at 84. The court held that

---

9. In *Doyle v. Ohio,* 426 U.S. 610, 617, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the Supreme Court stated that silence following *Miranda* warnings is "insolubly ambiguous" and, thus, not admissible.

10. In *Jenkins v. Anderson,* 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980), the Supreme Court held that comment on a defendant's silence before an arrest and rights' warning did not violate the constitutional rules when used to impeach the defendant's testimony. Likewise, in *Fletcher v. Weir,* 455 U.S. 603, 607, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982), the Supreme Court

held that a defendant's silence after an arrest but before rights' warnings could be used to impeach the defendant without violating the Due Process Clause.

11. The warning rules do "not specifically deal with the situation in which an 'innocent' question is addressed to a suspect and results unexpectedly in an incriminating response which could not have been foreseen." Drafters' Analysis of Mil.R.Evid. 305(b)(2), Manual for Courts-Martial, United States (1995 ed.), at A22–14.

Thompson's testimony was admissible but the instruction was error. The *Campbell* court reasoned:

> In *Bob v. The State* (3[2] Ala. 560, 565–66 (1858)), the accused, a slave, was indicted for an assault with intent to murder his master; and during a conversation among white persons, in the presence of his master and of the accused, the measure of a track of the person who had made the assault, was applied to the defendant's shoes, and found to correspond exactly with them; whereupon some of the persons present exclaimed, that those were the shoes that made the tracks of the guilty man; and Bob made no answer. His silence, under these circumstances, was given in evidence against him. This court humanely decided, that the evidence ought not to have been received at all; because, "the habitude of thought and feeling, the consciousness of inferiority, and the subordination and discipline belonging to his condition, made it perfectly natural that he should be silent, * * * from an apprehension that a contradiction might be deemed impertinence."

55 Ala. at 84. The *Bob* case makes the point that, where there is a superior-subordinate relationship, it would be "perfectly natural" for the subordinate to remain silent in the face of a superior's accusation.

As with modern courts, *Campbell* indicated evidence of silence in the face of an accusation should not be admitted "unless the evidence is of direct declarations, of that kind which naturally call for contradiction." The court reasoned that jurors should treat such evidence with care. *Id.*

By citing *Campbell,* Winthrop recognized the dividing line between superior and subordinate relationships and sought to protect military members accused by a superior. Thus, Mil.R.Evid. 304(h)(3) should not negate an inference of guilt from silence in all cases but only when there is an official investigation underway or the individual is subject to arrest or custody.[12]

Mil.R.Evid. 304(h)(3) has never been invoked by the appellate courts when the accused is not in confinement, under arrest, or in custody and being questioned by official investigators.[13]

### Relevance

Even though Mil.R.Evid. 304(h)(3) does not preclude the admission of appellant's silence, the evidence must also be both logically and legally relevant.

Evidence is logically relevant under Mil.R.Evid. 401 if it has a tendency to make the existence or nonexistence of a fact more probable or less probable than it would be without the evidence. *See* Mil.R.Evid. 402. Here, we consider appellant's silence in relation to the two questions: "Was it rape?" and "Well, did you do it?" Was this silence logically relevant? Normally, an innocent person would respond that the victim was making a false allegation of rape.

An argument against admitting evidence of a defendant's silence is that there are many legitimate reasons that an individual might choose not to respond to an accusation. The media has made people aware that there is a right to silence. A defendant might also wish to remain silent because he or she is embarrassed or angered by the accusation. These scenarios raise questions about the logical relevance of a defendant's silence.

Here, the defense theory of the case was that the sexual intercourse and sodomy were consensual, as evidenced by the fact that appellant danced with the victim and kissed her a number of times that evening. In support of this position, the defense argued that appellant did not unlawfully enter into the house.

12. Winthrop recognized in the 1800s that the rule against admission of silence requires that there be some element of officiality or a query by a superior for the rule to be invoked, much like the requirements of Article 31, Uniform Code of Military Justice, 10 USC § 831.

13. *See, e.g., United States v. Wynn,* 29 MJ 143 (CMA 1989)(questioning by exchange store detective who was private party); *United States v. Cain,* 5 MJ 844, 848 (ACMR 1978)(questioning by victim); *United States v. Armstrong,* 4 USCMA 248, 15 CMR 248 (1954)(questioning by friend of accused).

Considering the defense theory, one must conclude that a reasonable, innocent person would deny the accusation of rape. Appellant heard and understood the questions and was free to reply to them. If appellant had not committed the crime, the essence of his reply would have been the heart of the theory which the defense put forth at trial, *i.e.,* consent.

Additionally, it is important to consider the context of Sgt Pizzulo's questions to appellant. Prior to his arrest, appellant told Sgt Pizzulo that he had gotten "lucky" the previous night. It would be reasonable for an innocent person to claim consent under these circumstances. I conclude that appellant's silence in response to Sgt Pizzulo's questions is logically relevant.

As to legal relevance, there are various dangers in admitting this type of evidence, such as encouraging the prosecutor to manufacture silence, the ambiguity from silence, and the constitutional limitations of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). There is no indication that the query or the silence here was manufactured. However, there is an ambiguity in appellant's silence, just as there is an ambiguity in the victim's not immediately reporting a rape. Additionally, this is not silence while subject to custodial interrogation or silence soon after a rights' warning. Nor is this an instance where appellant did not understand the question or did not have the means to answer it because he did not have information within his own personal knowledge. Finally, introduction of this evidence does not impinge on appellant's right to remain silent. Thus, appellant's silence was legally relevant.

There are several arguments trial defense counsel could have advanced following introduction of this evidence. However, when all the evidence is considered together, the logical inference is that appellant did not want anybody to talk about what happened on the night in question. The fact that the lights were out at the victim's house certainly rebuts any assertion by appellant that there was a party. The rational inference when all the evidence is considered together is that appellant was attempting to spoil the evidence. Spoilation certainly is admissible under Mil.R.Evid. 404(b). The factfinders could find that appellant's failure to deny the accusation of rape or to explain what happened rebuts the defense of consent. Factfinders are not asked to draw an inference respecting circumstances of which appellant had no knowledge. This was a swearing contest between appellant and the victim.

Additionally, much of the evidence that the majority uses to demonstrate the prosecution's weakness, *i.e.,* psychiatric evidence used to impeach the victim, 48 MJ at 238, is generally held inadmissible unless the witness "exhibited a pronounced disposition to lie or hallucinate, or suffered from a severe illness, such as schizophrenia, that dramatically impaired her ability to perceive and tell the truth." *United States v. Butt,* 955 F.2d 77, 82 (1st Cir.1992).

If such evidence, plus SSgt H's comments to CL, establish the prosecution's weakness, the corresponding reaction of the defendant when asked by a friend about the charges should be admissible as relevant. The court members may then decide the weight to give the reaction of both individuals.

Even if silence was not legally relevant, one has to question whether appellant was prejudiced in light of the judge's instructions. Regarding the impact on the right to remain silent, the judge instructed the members of the following:

> The accused has an absolute right to remain silent. You will not draw any inference adverse to the accused from the fact that he did not testify as a witness. The fact that the accused has not testified must be disregarded by you.[14]

---

14. The federal courts have the following instruction as to silence in the face of an accusation:
Evidence has been introduced that statements accusing the defendant of the crime charged in the indictment were made, and that the statements were neither denied nor objected to by the defendant. If you find that the defendant actually was present and heard and understood the statements, and that they were made under such circumstances that the statements would have been denied if they were not true, then you may consider whether the defendant's

The judge then instructed the members on the presumption of innocence, the standard of guilt beyond a reasonable doubt, and the

silence was an admission of the truth of the statements.

burden of proof always being on the prosecution and never shifting to the defense.

For these reasons, I dissent.

S. Saltzburg and H. Perlman, 3 *Federal Criminal Jury Instructions* Appendix II, § 3.12 (1985).