UNITED STATES

v.

**Senior Airman Roy H. RUIZ,
United States Air Force.**

**ACM S29457.**

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 4 June 1997.

Decided 21 Dec. 1998.

Appellate Counsel for Appellant: Major Margo Stone Newton (argued), Colonel Douglas H. Kohrt, and Lieutenant Colonel Ray T. Blank, Jr.

Appellate Counsel for the United States: Captain Martin J. Hindel (argued), Lieutenant Colonel Anthony P. Dattilo, Lieutenant Colonel Michael J. Breslin, and Major Ronald A. Rogers.

Before ROTHENBURG, Chief Judge, YOUNG, Senior Judge, SENANDER and MORGAN, Appellate Military Judges.

## OPINION OF THE COURT

YOUNG, Senior Judge:

Contrary to his pleas, the accused was convicted of larceny of several items from the Army and Air Force Exchange Service (AAFES). Article 121, UCMJ, 10 U.S.C. § 921. His approved sentence includes a bad-conduct discharge, confinement for 2 months, and reduction to E–1. The accused claims the military judge erred by (1) denying a motion to suppress his statements to an AAFES store detective and the evidence he turned over to her, and (2) failing to prohibit the prosecutor from raising the fact that the accused never proclaimed his innocence after his detention. In reaching our decision, we were assisted by the excellent oral arguments of appellate counsel heard at the United States Air Force Academy on 9 November 1998. Finding no error, we affirm.

### I. The Motion to Suppress

#### A. Facts

On 23 November 1996, Jean Rodarte, a civilian store detective for AAFES at the Fitzsimmons Garrison post exchange (PX), Colorado, observed the accused pick up a compact disc receiver in the electronics section of the PX and place it in his hand basket. He was wearing a large winter jacket despite relatively mild temperatures outside. Later, he went to the men's clothing section and took an item into the dressing room. When he departed the dressing room, the accused took the receiver box back to the electronics section. The accused purchased a few items and then departed the store. On the street outside the PX, Ms. Rodarte and another store detective stopped the accused and asked him if he would accompany them back to the PX office. The accused agreed to do so. Once back in the office, the accused was invited to sit. Ms. Rodarte told the accused, "There seems to be some AAFES merchandise that hasn't been paid for." The accused said, "Yes," took the receiver (without the box), a compact disc, and

some razor blades from inside/under his coat and placed them on the table. He then said, "You got me." Ms. Rodarte telephoned the Department of Defense (DoD) civilian police who were responsible for policing Fitzsimmons Garrison. While in the office, the store detectives asked the accused for his identification card, although Ms. Rodarte can not remember when in the sequence of events this occurred. When the DoD police arrived, Ms. Rodarte provided them with a statement describing this incident and then left the room. The empty box for the receiver was found on the shelf in the store.

Prior to entering his pleas, the accused moved to suppress the statements he made to Ms. Rodarte. The accused claimed that his statements were the product of an unlawful interrogation because Ms. Rodarte did not advise him of his rights under Article 31, UCMJ. The accused did not assert that he was in custody, and therefore, should have been advised of his right to counsel. After conducting a hearing in which Ms. Rodarte was the only witness, the military judge denied the motion and admitted the accused's statements and the merchandise he allegedly took from beneath his jacket. The military judge concluded that Ms. Rodarte's statement was not an interrogation, so no Article 31(b) warnings were necessary, that the accused's statements were spontaneous and voluntary, and that the evidence would have been inevitably discovered.

## B. The Law

A "person subject to the code" (UCMJ) may not "interrogate" a suspect without first informing him of the nature of the accusation, that he has a right to remain silent, and that any statement he makes may be used as evidence against him in a court-martial. Article 31(b), UCMJ. A statement taken in violation of this provision is involuntary and, normally, inadmissible. *See* Mil.R.Evid. 305(c) and 304(a). "A 'person subject to the code' includes a person acting as a knowing agent of a military unit or of a person subject to the code." Mil.R.Evid. 305(b)(1).

> [I]n light of Article 31(b)'s purpose and its legislative history, the Article applies only to situations in which, because of military rank, duty, or other similar relationship,

there might be subtle pressure on a suspect to respond to an inquiry. Accordingly, in each case it is necessary to determine whether (1) a questioner subject to the code was acting in an official capacity in his inquiry or only had a personal motivation; and (2) whether the person questioned perceived that the inquiry involved more than a casual conversation. Unless both prerequisites are met, Article 31(b) does not apply.

*United States v. Duga,* 10 M.J. 206, 210 (C.M.A.1981) (citations omitted). *Accord United States v. Rios,* 48 M.J. 261, 264 (1998).

Thus, a civilian investigator becomes a "person subject to the code" when (1) "the scope and character of the cooperative efforts demonstrate 'that the two investigations merged into an indivisible entity'" and (2) the "civilian investigator acts 'in furtherance of any military investigation, or in any sense as an instrument of the military.'" *United States v. Quillen,* 27 M.J. 312, 314 (C.M.A.1988) (quoting *United States v. Penn,* 39 C.M.R. 194, 199, 1969 WL 5949 (C.M.A. 1969) (quoting *United States v. Grisham,* 16 C.M.R. 268, 271, 1954 WL 2452 (C.M.A. 1954))). "In determining whether a civilian investigator is 'acting as an instrument of the military,' a key factor is the 'degree of control' exercised by military authorities over the civilian investigator. A duty to report criminal information does not necessarily make the reporting official 'an instrument of the military.'" *United States v. Payne,* 47 M.J. 37, 43 (1997) (quoting *United States v. Raymond,* 38 M.J. 136, 139 (C.M.A.1993)).

The litigation on this issue centers around our superior court's holding in *Quillen.* In that case, an AAFES store detective, Mrs. Holmes, stopped the accused outside the exchange on suspicion he had shoplifted AAFES merchandise. She showed the accused her credentials, asked for his military identification card, which he voluntarily surrendered, and escorted him back to the manager's office. At the office, the detective asked the accused if he had a receipt for the merchandise. He replied that he had purchased the item earlier in the day and thought he must have lost it. Mrs. Holmes

asked more particular questions to which the accused responded. She then called the Security Police. The Security Police apprehended Specialist Quillen and advised him of his Article 31 rights. After the rights advisement, Mrs. Holmes continued to question the accused. The Court of Military Appeals held that Mrs. Holmes, "in a very real and substantial sense acted as an instrument of the military." *Id.* at 314. The Court reached this conclusion on the following bases:

> (1) AAFES, which employed Mrs. Holmes and directed her actions, was "under the control of military authorities." *Id.* In support of this proposition, the majority cited *Standard Oil Co. v. Johnson,* 316 U.S. 481, 485, 62 S.Ct. 1168, 86 L.Ed. 1611 (1942) and military regulations.

> (2) Mrs. Holmes' questioning of the accused was "at the behest of military authorities and in furtherance of their duty to investigate crime at base exchanges." *Id.* at 314–15. The court based its conclusion on service and AAFES regulations which demonstrated the close interaction between AAFES and their employees and military authorities in the prosecution of shoplifters.

> (3) The Court was persuaded that the accused "perceived that Mrs. Holmes' inquiries involved more than casual conversation." *Id.* at 315. The Court found "of great significance that questioning of appellant did not occur at the original stop but after he was escorted to the manager's office by store employees." *Id.* The Court suggested that Mrs. Holmes would not have violated the accused's constitutional rights if she had merely asked him to produce a receipt.

Whether a confession is voluntary is a legal question that we review *de novo. United States v. Martinez,* 38 M.J. 82, 86 (C.M.A. 1993) (citing *Miller v. Fenton,* 474 U.S. 104, 110, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985)). While Article 66(c), UCMJ, 10 U.S.C. § 866(c) does not require that we do so, normally, we will defer to the military judge's findings of fact unless they are clearly erroneous. *United States v. Cole,* 31 M.J.

270, 272 (C.M.A.1990); *United States v. Givens,* 30 M.J. 294, 299 (C.M.A.1990).

## C. Discussion

■ Since *Quillen,* it appears that AAFES has attempted to change the way in which store detectives operate. Ms. Rodarte testified that she doesn't work for any military establishment, neither the Army nor the Air Force provides any guidance on how to handle military personnel suspected of shoplifting, and she doesn't work in conjunction with any military law enforcement agency. She received her training through AAFES from contract security firms, not from the military. Ms. Rodarte also testified that she is not permitted to question shoplifting suspects, but may only advise them that there may be some AAFES merchandise that may not have been paid for. She admitted that when she makes that statement, she hopes the individual will admit shoplifting and voluntarily relinquish the merchandise. She provides DoD law enforcement personnel with copies of statements concerning shoplifting incidents and may testify in courts-martial.

Based on Ms. Rodarte's testimony alone, it would be difficult to conclude that she was a knowing agent of the military or that military authorities exercised any control over her investigation. The fact that she reported the incident to DoD police does not, by itself, make her "an instrument of the military." *See Payne,* 47 M.J. at 43. But, the current regulations governing the relationship between AAFES and the services tell a different story. Little, if anything has changed, since the Court of Military Appeals found that AAFES "was under the control of military authorities." *Quillen,* 27 M.J. at 314. AAFES is still a joint command of the Army and Air Force. Air Force Regulation (AFR) 147–7, *Army and Air Force Exchange Service General Policies,* ¶ 1–7a (17 Jun 1988). Installation commanders must ensure that "incidents of criminality" at exchanges are reported for investigation to the appropriate military investigative organization. *Id.* at ¶ 2–6a(8). Commanders are responsible for revoking or suspending exchange privileges of those who steal AAFES merchandise. AFR 147–14, *Army and Air Force Exchange*

*Service Operating Policies,* ¶ 2–15 (15 Jan 93).

Since *Quillen,* the Court of Appeals for the Armed Forces has had several opportunities to discuss whether a civilian is a government agent such that he is required to advise a suspect of his Article 31(b) rights. *E.g., Payne,* 47 M.J. 37 (1997); *United States v. Price,* 44 M.J. 430 (1996); *United States v. Powell,* 40 M.J. 1 (C.M.A.1994); *United States v. Raymond,* 38 M.J. 136 (C.M.A. 1993); *United States v. Lonetree,* 35 M.J. 396 (C.M.A.1992). While some of these cases suggest that *Quillen* would be decided differently today, *Powell* confirms the status of AAFES store detectives as agents of the military. The facts of this case are not sufficiently different to distinguish it from *Quillen.* Thus, we are constrained by *Quillen* to conclude that AAFES is under the control of the military and Ms. Rodarte acted at the behest of military authorities. Therefore, for the purposes of Article 31(b), Ms. Rodarte became a "person subject to the code" and was required to advise him of his rights under Article 31(b) before interrogating him. The question is, Did Ms. Rodarte "interrogate" the accused?

◼ In the military, " '[i]nterrogation' includes any formal or informal questioning in which an incriminating response either is sought or is a reasonable consequence of such questioning." Mil.R.Evid. 305(b)(2). The rule is drawn from precedents of the Supreme Court and is written broadly enough to prevent "attempts to circumvent warnings requirements through subtle conversations." Stephen A. Saltzburg, Lee D. Schinasi, and David A. Schlueter, *Military Rules of Evidence Manual* 225 (4th ed.1997).

In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court held that before law enforcement authorities may question a suspect who is in custody, they must advise him of his rights to remain silent and to have an attorney. The premise of *Miranda* is that custodial interrogation is inherently coercive and thus undermines the privilege against compulsory self-incrimination. *Id.* at 457–58, 86 S.Ct. 1602. The Supreme Court defined interrogation as *"questioning* initiated by law enforcement officers" (*Id.* at 444, 86 S.Ct. 1602 (emphasis added)), but suggested that several other police practices that did not involve express questioning would be included within the definition.

In *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the accused was arrested for a murder committed with a shotgun and invoked his right to counsel. While Innis was being transported, a police officer noted to the other officers in the vehicle that the site of the shooting was located near a school for handicapped children and, "God forbid one of them might find a weapon with shells and they might hurt themselves." *Id.* at 294–95, 100 S.Ct. 1682. The accused interrupted the conversation and told the officers where the shotgun was located. The Supreme Court concluded that the term interrogation involved more than just questioning.

> "Interrogation, as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself."
>
> ... That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (*other than those normally attendant to arrest and custody* ) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police.

*Id.* at 300–01, 100 S.Ct. 1682 (footnotes omitted) (emphasis added). Nevertheless, the Supreme Court found the police conversation did not amount to interrogation. The officers' comments were not particularly evocative and "the respondent was not subjected by the police to words or actions that the police should have known were reasonably likely to elicit an incriminating response from him." *Id.* at 303, 446 U.S. 291.

We hold that Ms. Rodarte did not interrogate the accused. She did no more than advise the accused why he was stopped and why she asked him to accompany her back to the office. Such statements are "normal-

ly attendant to" the detention process. *Cf. Innis,* 446 U.S. at 300, 100 S.Ct. 1682. Furthermore, we are convinced that Ms. Rodarte's comment was not particularly evocative and she should not have known that the comment was reasonably likely to elicit an incriminating response from the accused. Article 66(c), UCMJ, 10 U.S.C. § 866(c). *See Innis,* 446 U.S. at 303, 100 S.Ct. 1682. We are not concerned that, rather than explaining the stop to the accused in front of the PX, Ms. Rodarte waited until they were back in the privacy of the manager's office. *But see Quillen,* 27 M.J. at 315 (finding great significance, for determining that accused should have received Article 31 warnings, in the fact that questioning began after the accused was back in the manager's office). We are similarly unimpressed by the fact that Ms. Rodarte welcomed, and even hoped for, a confession. "Officers do not interrogate a suspect simply by hoping that he will incriminate himself." *Arizona v. Mauro,* 481 U.S. 520, 529, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987). The accused's statements were voluntary.

## II. Comment on the Accused's Silence

### A. Facts

During findings, Ms. Rodarte and Officer Jack Segrest, the civilian DoD policeman who responded to Ms. Rodarte's telephone call for assistance, testified for the prosecution. Ms. Rodarte's testimony was consistent with her testimony during the motion to suppress. Officer Segrest testified that when he arrived at the PX, the CD player was sitting on the desk and was not in a box, and that one of the AAFES detectives retrieved the empty box from the audio department of the store.

The accused's testimony on findings was in substantial conflict with that of both the prosecution witnesses. On direct examination, he testified that he looked at the CD player, put it back on the shelf, bought a few minor items, and then, without exiting the store, decided to go back and purchase the CD player and razor blades. He insisted that he was taking the CD player to the layaway counter when Ms. Rodarte stopped him, inside the PX. He claimed that the CD player was under his arm, not his jacket, and that it was still in its box when he handed it

over to the store detectives. He claimed that the CD player was taken out of the box when the store detectives and Officer Segrest were searching for the accused's identification card.

During cross-examination, the accused testified that he did not go to the dressing room and that he actually exited the exchange, but was still inside the building, in the foyer where concessionaires sell merchandise, when Ms. Rodarte stopped him. He also disputed Ms. Rodarte's version of what happened in the manager's office. The accused insisted that when they arrived at the manager's office, he asked, "Is there a problem? I can pay for these items," to which one of the detectives answered, "It's too late." To test the credibility of this statement, the trial counsel asked the accused if he had ever said, "Too late for what?" The accused claimed to have instead asked, "What's going on?" to which the detective did not reply. Trial counsel then asked the accused if he had protested his innocence. The accused testified that he did not because they might use it against him. The trial counsel continued to probe how little sense that made in light of his other questions to the detectives. Trial counsel also questioned why the accused did not proclaim his innocence to Officer Segrest when he arrived on the scene. The accused replied that he knew Officer Segrest did not have the authority to release him, so it would have been a wasted effort.

During his closing argument on findings, the trial counsel highlighted the differences between the testimonies of the prosecution witnesses and of the accused. He also commented on the unreasonableness of the accused's version of what occurred in the manager's office. The trial counsel repeated this theme during his rebuttal argument.

### B. The Law

The accused asserts that the prosecutor should not have cross-examined him about his failure to proclaim his innocence and should not have argued any inference therefrom. (Citing U.S. Const. amend. V; Mil. R.Evid. 301(f)(3) and 304(h)(3)). "A person's failure to deny an accusation of wrongdoing concerning an offense for which at the time

of the alleged failure the person was under official investigation ... does not support an inference of an admission of the truth of the accusation." Mil.R.Evid. 304(h)(3). *See United States v. Cook*, 48 M.J. 236 (1998) (holding military judge erred by admitting, over objection of the accused, evidence of an accused's silence in response to a friend's question as to whether he had committed rape). Since he did not object at trial, the accused claims he is entitled to relief because the judge's failure to intervene *sua sponte* amounted to plain error.

Normally, in federal courts, an accused forfeits a right, whether it be constitutional or not, by failing to "make timely assertion of the right before a tribunal having jurisdiction to determine it." *United States v. Olano*, 507 U.S. 725, 731, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (quoting *Yakus v. United States*, 321 U.S. 414, 444, 64 S.Ct. 660, 88 L.Ed. 834 (1944)). However, "[a] rigid and undeviating judicially declared practice under which courts of review would invariably and under all circumstances decline to consider all questions which had not previously been specifically urged would be out of harmony with ... the rules of fundamental justice." *Hormel v. Helvering*, 312 U.S. 552, 61 S.Ct. 719, 85 L.Ed. 1037 (1941) *quoted in Olano*, 507 U.S. at 731, 113 S.Ct. 1770. In that vein, Federal Rule of Criminal Procedure (F.R.Cr. P.) 52(b) bestows upon appellate courts a limited power to grant relief despite the failure of the party to raise the issue in the lower court. It provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." *Olano*, 507 U.S. at 731, 113 S.Ct. 1770.

In general, the military adopted the federal practice. Absent plain error, an accused waives (forfeits) an appellate challenge to the admission of prosecution evidence if he fails to object. Mil.R.Evid. 103(a) and (d); *United States v. Rynning*, 47 M.J. 420, 421 (1998). Absent plain error, an accused waives (forfeits) an appellate challenge to the prosecutor's closing arguments if he fails to object. R.C.M. 919(c); *United States v. Causey*, 37 M.J. 308, 311 (C.M.A.1993). While these rules claim the failure to object "waives" the

objection, the more appropriate term is "forfeits." "A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).

The plain error doctrine makes sense. It places the burden of objecting on the counsel at trial when the facts can be developed and the judge has an opportunity to make findings of fact. "[W]ithout viewing the error in the context of the facts of the particular case, '[i]t is simply not possible for an appellate court to assess the seriousness of the claimed error.'" *United States v. Fisher*, 21 M.J. 327, 328 (C.M.A.1986) (quoting *United States v. Young*, 470 U.S. 1, 16, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985)).

In *Fisher*, the Court of Military Appeals defined plain error as error that is "obvious and substantial, it must also have 'had an unfair prejudicial impact on the jury's deliberations.'" *Fisher*, 21 M.J. at 328 (quoting *Young*, 470 U.S. at 16, n. 14, 105 S.Ct. 1038). The service appellate courts adopted *Fisher* and have followed each refinement promulgated by the Court of Appeals for the Armed Forces in response to Supreme Court decisions.

In *United States v. Powell*, 49 M.J. 460 (1998) (amended Nov. 24, 1998), the Court of Appeals for the Armed Forces criticized the service courts of criminal appeals for using the plain error test announced by the Supreme Court in *Olano*, 507 U.S. at 732–34, 113 S.Ct. 1770. After analyzing and comparing the appropriate military and civilian statutes and procedural rules, the Court of Appeals concluded that *Olano* applied only to discretionary courts operating under the Federal Rules of Criminal Procedure. The service courts of criminal appeals are not discretionary courts and do not operate under the federal rules. While not explicitly stating so, the majority opinion seems to suggest that the forfeiture doctrine is dead in the service courts of criminal appeals.

### C. Discussion

Considering our statutory mandates, we draw the following lessons from *Powell*:

(1) Whether asserted on appeal by an accused, or noticed by this Court during our independent review of the entire record pursuant to Article 66(c), UCMJ, 10 U.S.C. § 866(c), we *must* review all errors and determine their impact, if any, on an appellant's substantial rights.

(2) We may affirm only the portions of the findings and sentence that are correct in law and fact. Article 66(c), UCMJ.

(3) We may not disapprove a finding or sentence because of an error of law unless the error materially prejudiced the substantial rights of the accused. Article 59(a), UCMJ, 10 U.S.C. § 859(a).

(4) If an error materially prejudiced the substantial rights of an accused, we may still approve the findings and sentence if, under all the circumstances, the prejudicial error was harmless. *See Powell*, 49 M.J. at 464–65.

 Thus, regardless of whether the issue was raised at trial, for the first time on appeal, or noticed by the court during its review under Article 66(c), we will reverse if there is (1) error, (2) which is prejudicial to the accused's substantial rights, and (3) under all the circumstances of the case, taken as a whole, the error was not harmless.

 In light of these lessons, we have examined the accused's assertion of error. We find that the military judge did not err in *sua sponte* failing to restrict the prosecutor's closing argument or cross-examination of the accused. The prosecutor was not commenting on the accused's silence—the accused admitted that he spoke to the detectives. Instead, the prosecutor was attacking the accused's version of the events in the manager's office. The accused tried to present himself as an innocent man who had been wrongly accused of shoplifting by the lying AAFES store detective and DoD police officer. In his testimony, the accused contradicted Ms. Rodarte's version of both what occurred and what was said. The prosecutor had a duty to test that story and point out the inconsistencies and lack of logic in it. We suspect that the defense counsel and the experienced military judge did not intervene because they recognized the prosecutor's actions for what they were—proper cross-examination.

Even had we found that the prosecutor's questions and argument were error that prejudiced substantial rights, the accused would still not be entitled to relief. Under the facts of this case, any error would have been harmless. The accused's story is preposterous, from beginning to end. He suggests, without specifically stating so, that the AAFES detectives must have been in cahoots with Officer Segrest. We have no doubt that the court members would have rejected the accused's story even if the prosecutor had foregone cross-examination.

### III. Conclusion

The findings are correct in law and fact, and no error prejudicial to the substantial rights of the accused occurred. Accordingly, the findings and sentence are

AFFIRMED.

Chief Judge ROTHENBURG, Judge SENANDER, and Judge MORGAN concur.