UNITED STATES, Appellee,

v.

Roy H. RUIZ, Senior Airman, U.S. Air Force, Appellant.

No. 99–0509.
Crim.App. No. S29457.

U.S. Court of Appeals for the Armed Forces.

Argued Dec. 10, 1999.

Decided Sept. 18, 2000.

Gierke, J., filed opinion concurring in part and in the result and dissenting in part.

Crawford, Chief Judge, filed opinion concurring in the result.

Sullivan, J., filed dissenting opinion.

Effron, J., filed dissenting opinion in which Sullivan, J., joined.

EVERETT, S.J., announced the judgment of the Court. GIERKE, J., filed an opinion concurring in part and in the result and dissenting in part. CRAWFORD, C.J., filed an opinion concurring in the result. SULLIVAN, J., filed a dissenting opinion. EFFRON, J., filed a dissenting opinion, in which SULLIVAN, J., joined.

For Appellant: *Captain Bryan A. Bonner* (argued); *Colonel Jeanne M. Rueth* (on brief); *Colonel Theodore J. Fink* and *Major Margo Stone Newton.*

For Appellee: *Captain Martin J. Hindel,* USAFR (argued); *Colonel Anthony P. Dattilo, Lieutenant Colonel Ronald A. Rodgers,* and *Captain James C. Fraser* (on brief).

1. Until recently this was the location of Fitzsim-

Senior Judge EVERETT announced the judgment of the Court.

Contrary to his pleas, a special court martial with officer members convicted Senior Airman Roy H. Ruiz of stealing several items from the Army and Air Force Exchange Service (AAFES) post exchange (PX) located at Fitzsimmons Garrison, Colorado.[1] *See* Art. 121, Uniform Code of Military Justice, 10 USC § 921. His sentence included a bad-conduct discharge, confinement for 2 months, and reduction to the grade of E–1. This sentence was approved by the convening authority on September 24, 1997. The Court of Criminal Appeals affirmed the findings and sentence on December 21, 1998. *50 MJ 518.*

This Court granted review of these issues:

**I**

WHETHER THE MILITARY JUDGE ERRED IN DENYING THE DEFENSE MOTION TO SUPPRESS STATEMENTS ALLEGEDLY MADE BY APPELLANT TO AAFES STORE DETECTIVES.

**II**

WHETHER IT WAS PLAIN ERROR FOR THE PROSECUTION TO CROSS–EXAMINE APPELLANT AND ARGUE, AND FOR THE MILITARY JUDGE TO PERMIT THE CROSS–EXAMINATION AND ARGUMENT, ABOUT THE FACT THAT APPELLANT DID NOT PROCLAIM HIS INNOCENCE WHEN HE WAS APPROACHED BY THE AAFES STORE DETECTIVES, IN VIOLATION OF APPELLANTS FIFTH AMENDMENT AND ARTICLE 31 RIGHTS.

Finding no prejudicial error, we affirm.

**I. MOTION TO SUPPRESS STATEMENTS MADE TO AAFES STORE DETECTIVES.**

As to appellants motion to suppress, the facts were summarized by the court below:

On 23 November 1996, Jean Rodarte, a civilian store detective for AAFES at the Fitzsimmons Garrison post exchange (PX),

mons Army Hospital.

Colorado, observed the accused pick up a compact disc receiver in the electronics section of the PX and place it in his hand basket. He was wearing a large winter jacket despite relatively mild temperatures outside. Later, he went to the men's clothing section and took an item into the dressing room. When he departed the dressing room, the accused took the receiver box back to the electronics section. The accused purchased a few items and then departed the store. On the street outside the PX, Ms. Rodarte and another store detective stopped the accused and asked him if he would accompany them back to the PX office. The accused agreed to do so. Once back in the office, the accused was invited to sit. Ms. Rodarte told the accused, "There seems to be some AAFES merchandise that hasn't [sic] been paid for." The accused said, "Yes," took the receiver (without the box), a compact disc, and some razor blades from inside/under his coat and placed them on the table. He then said, "You got me." Ms. Rodarte telephoned the Department of Defense (DoD) civilian police who were responsible for policing Fitzsimmons Garrison. While in the office, the store detectives asked the accused for his identification card, although Ms. Rodarte can not remember when in the sequence of events this occurred. When the DoD police arrived, Ms. Rodarte provided them with a statement describing this incident and then left the room. The empty box for the receiver was found on the shelf in the store.

Prior to entering his pleas, the accused moved to suppress the statements he made to Ms. Rodarte. The accused claimed that his statements were the product of an unlawful interrogation because Ms. Rodarte did not advise him of his rights under Article 31, UCMJ, 10 USC § 831. The accused did not assert that he was in custody, and therefore, should have been advised of his right to counsel. After conducting a hearing in which Ms. Rodarte was the only witness, the military judge

denied the motion and admitted the accused's statements and the merchandise he allegedly took from beneath his jacket. The military judge concluded that Ms. Rodarte's statement was not an interrogation, so no Article 31(b) warnings were necessary, that the accused's statements were spontaneous and voluntary, and that the evidence would have been inevitably discovered.

50 MJ at 519–20.

■ A military judge's evidentiary rulings are generally reviewed under the abuse-of-discretion standard. However, a ruling that a statement was made voluntarily may present a question of law which this Court may review *de novo*. *See United States v. Martinez*, 38 MJ 82, 86 (1993). Likewise, whether an Article 31(b) warning is required may also require *de novo* review. *United States v. Ravenel*, 26 MJ 344, 352 (CMA 1988) (Cox, J., concurring in the result).

A person subject to the Uniform Code of Military Justice may not "interrogate" a suspect without first informing the suspect of the nature of the accusation, the right to remain silent, and that any statement made may later be used as evidence in a court-martial. Art. 31(b), UCMJ, 10 USC § 831(b). Subject to a few exceptions, any statement obtained in violation of this provision is inadmissible. Mil.R.Evid. 305(c) and 304(a), Manual for Courts–Martial, United States (1998 ed.). Moreover, the Manual for Court Martial requires that, under some circumstances, persons not subject to the Code provide warnings to a suspect.[2]

This Court has previously addressed the question whether an AAFES store detective must give a warning. *United States v. Quillen*, 27 MJ 312 (1988). There we held that an AAFES store detective "in a very real and substantial sense acted as an instrument of the military" and thus was subject to the warning requirement of Article 31(b). *Id.* at 314. Despite the urging of the Government, we see no need to disturb or revisit that holding, even though in this case the military

---

2. On the other hand, we have held that under some circumstances a person subject to the Code—for example, an undercover agent—is not

within the scope of the warning requirement in Article 31(b). *See, e.g., United States v. Gibson*, 3 USCMA 746, 14 CMR 164 (1954).

judge and the Court of Criminal Appeals have disagreed on whether the AAFES security personnel at Fitzsimmons were similarly instruments of the military and subject to the warning requirement of Article 31(b).

In denying the motion to suppress the accused's statement to Ms. Rodarte, the military judge made several essential findings. Among other things the judge found

> that Ms Rodarte and Ms Ray received specific training from AAFES which prohibits them from restraining or attempting to physically detain suspected shoplifters if they refuse to accompany them to the managers office or walk away from them. Similarly they are trained that they are not to ask questions or interrogate suspected shoplifters. They were however, trained to make the statement about unpaid merchandise as part of standard operating procedures. In making the statement, Ms Rodarte admitted that "we would hope to get a response," but she didn't expect anything in particular, because her experience in the past has been that a lot of times she doesn't get a response, some suspects sit still and never respond.

On the basis of these findings, the judge distinguished *Quillen*, where "the scope and character of the cooperative efforts between BX store detectives and the base military police ... 'merged into an indivisible entity.'" Furthermore, the judge found that "no interrogation" had been "conducted" within the meaning of Article 31(b).

Unlike the military judge, the Court of Criminal Appeals concluded that "[t]he facts of this case are not sufficiently different to distinguish it from *Quillen*."[3] Accordingly, that court held that the AAFES store detectives who detained Airman Ruiz were agents of the military who were subject to the Code and "required to advise him of his rights under Article 31(b) before interrogating him." 50 MJ at 522.

We need not decide between the respective positions taken below to resolve the fact-specific issue of whether the Article 31(b) requirement applied to the AAFES security personnel in this case. Instead, we affirm because we join both the military judge and the Court of Criminal Appeals in holding that Ms. Rodarte did not "interrogate" the accused. We recognize, of course, that to conform with the purpose of Article 31, "interrogation" must be construed to include "any formal or informal questioning in which an incriminating response is sought or is a reasonable consequence of such questioning." Mil.R.Evid. 305(b)(2). For example, asking a suspect to point out his clothing, his locker, or his automobile may constitute questioning and require a warning. *See, e.g., United States v. Taylor*, 5 USCMA 178, 17 CMR 178 (1954). Mil.R.Evid. 305(b)(2) is derived from Supreme Court precedents and was purposefully drafted in a broad fashion to thwart "attempts to circumvent warnings requirements through subtle conversations." S. Saltzburg, L. Schinasi, and D. Schlueter, *Military Rules of Evidence Manual* 225 (4th ed.1997). Therefore, interrogation involves more than merely putting questions to an individual. *Cf. Brewer v. Williams*, 430 U.S. 387, 399, 97 S.Ct. 1232, 1240, 51 L.Ed.2d 424 (1977) (concluding that deliberately and designedly setting out to elicit information constituted interrogation).

---

3. As the Court of Criminal Appeals noted, "Since *Quillen*, it appears that AAFES has attempted to change the way in which store detectives operate." 50 MJ 518, 521 (1998) (observing that the detective in question "testified that she doesn't work for any military establishment," or "in conjunction with any military law enforcement agency[,]" nor has she received any training from the military). However, the court below, after reviewing the applicable regulations, concluded that "[l]ittle, if anything has changed, since the Court of Military Appeals found that AAFES 'was under the control of military authorities.'" *Id.* (quoting *United States v. Quillen*, 27 MJ 312, 314 (1988)). AAFES remains "a joint command of the Army and Air Force. Air Force Regulation (AFR) 147-7. *Army and Air Force Exchange Service General Policies*, ¶ 1–7a (17 June 1988). Installation commanders" are still under the obligation to "ensure that 'incidents of criminality' at exchanges are reported ... to the appropriate military investigative organization[,] [i]d. at ¶ 2–6a(8)[,]" and commanders are still "responsible for revoking or suspending exchange privileges of those who steal AAFES merchandise. AFR 147-14, *Army and Air Force Exchange Service Operating Policies*, ¶ 2–15 (15 Jan. 93)." 50 MJ at 521.

Ruiz argues that Ms. Rodarte's statement that "[t]here seems to be some AAFES merchandise that has not been paid for" constituted an interrogation. In support of this contention, he points to the testimony of Ms. Rodarte that the AAFES store detectives "would hope to get a response" when they make this statement. Appellant maintains that this statement constituted interrogation because an incriminating response either was sought or was a reasonable consequence of that statement.

■ However, interrogation does not include "words or actions ... normally attendant to arrest and custody." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980). Accordingly, in *United States v. Byers*, 26 MJ 132 (1988), this Court noted that merely informing a person that he was suspected of using drugs would not mandate an Article 31 rights' advisement. *Id.* at 135 n. 2.

■ In *United States v. Powell*, this Court concluded that initial statements made by a shoplifting suspect to AAFES store detectives had been "spontaneously made and not in response to interrogation." However, this Court also ruled that later statements by the shoplifter were in response to interrogation. The former statements were made immediately after the suspect had been informed why he was being detained, 40 MJ 1, 3 (1994), while the later statements were made after a military policeman had arrived and after the suspect had been asked a number of further questions, *id.* at 2, 3.

Appellant tries to distinguish *Powell* on the ground that in *Powell* the shoplifting suspect initiated the conversation by asking the AAFES detectives why he was being detained. However, this is not a significant distinction because Ms. Rodarte's statement—like the initial conversation in *Powell*—was merely informing appellant that he was suspected of not having paid for some merchandise. In *Quillen*, this Court noted that the questioning of the suspect went beyond asking him "to produce his receipt for the merchandise, a practice to which" this Court had "no objection on constitutional or codal grounds." 27 MJ at 315. In this case,

appellant treats as "interrogation" the mere statement that "[t]here seems to be some AAFES merchandise that has not been paid for." In context, however, this statement is not functionally different from asking the suspect to provide a receipt for the stolen merchandise or informing him of the potential charges against him.

Accordingly, we agree with the lower court's holding "that Ms. Rodarte did not interrogate the accused," but instead "did no more than advise the accused why he was stopped and why she asked him to accompany her back to the office." 50 MJ at 522. Because Ms. Rodarte's statements and actions constituted words and actions normally attendant to the detention process for suspected shoplifters, the accused's statements were voluntary and admissible under the Military Rules of Evidence and the precedents of this Court and the Supreme Court.

## II. THE TRIAL COUNSEL'S COMMENTS ON THE ACCUSED'S SILENCE.

Sergeant Ruiz took the stand to testify in his own defense. His testimony, which was in substantial conflict with that of the prosecution witnesses, was summarized by the court below in this manner:

On direct examination, he testified that he looked at the CD player, put it back on the shelf, bought a few minor items, and then, without exiting the store, decided to go back and purchase the CD player and razor blades. He insisted that he was taking the CD player to the layaway counter when Ms. Rodarte stopped him, inside the PX. He claimed that the CD player was under his arm, not his jacket, and that it was still in its box when he handed it over to the store detectives. He claimed that the CD player was taken out of the box when the store detectives and Officer Segrest were searching for the accused's identification card.

During cross-examination, the accused testified that he did not go to the dressing room and that he actually exited the exchange, but was still inside the building, in the foyer where concessionaires sell merchandise, when Ms. Rodarte stopped him. He also disputed Ms. Rodarte's version of

what happened in the manager's office. The accused insisted that when they arrived at the manager's office, he asked, "Is there a problem? I can pay for these items," to which one of the detectives answered, "It's too late." To test the credibility of this statement, the trial counsel asked the accused if he had ever said, "Too late for what?" The accused claimed to have instead asked, "What's going on?" to which the detective did not reply. Trial counsel then asked the accused if he had protested his innocence. The accused testified that he did not because they might use it against him. The trial counsel continued to probe how little sense that made in light of his other questions to the detectives. Trial counsel also questioned why the accused did not proclaim his innocence to Officer Segrest when he arrived on the scene. The accused replied that he knew Officer Segrest did not have the authority to release him, so it would have been a wasted effort.

During his closing arguments on findings, the trial counsel highlighted the differences between the testimonies of the prosecution witnesses and of the accused. He also commented on the unreasonableness of the accused's version of what occurred in the manager's office. The trial counsel repeated this theme during his rebuttal argument.

50 MJ at 523.

Despite the failure of his counsel to object at trial, appellant now asserts that he should not have been cross-examined about his failure to proclaim his innocence and that the prosecutor should not have argued any inferences therefrom.

 Usually any objection to questions asked on cross-examination must be made at the time they are asked. Also, failure to make timely objection to matters raised in argument will waive any issue on appeal with respect thereto in the absence of plain error. *See United States v. Ramos*, 42 MJ 392, 397 (1995). To show plain error, an appellant must establish an error which "must not only be both obvious and substantial, it must also have 'had an unfair prejudicial impact on the

jury's deliberations.' " *United States v. Fisher*, 21 MJ 327, 328 (CMA 1986) (quoting *United States v. Young*, 470 U.S. 1, 16–17 n. 14, 105 S.Ct. 1038, 1047, 84 L.Ed.2d 1 (1985)); *see also United States v. Powell*, 49 MJ 460 (1998); *United States v. Riley*, 47 MJ 276 (1997). This Court may exercise its discretion to reverse on a forfeited error only if the error materially prejudices the substantial rights of appellant, *see Powell*, 49 MJ at 465, or the error seriously affects the fairness, integrity, or public reputation of judicial proceedings, *see Johnson v. United States*, 520 U.S. 461, 467, 117 S.Ct. 1544, 1549, 137 L.Ed.2d 718 (1997). The plain-error doctrine "is to be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." *United States v. Frady*, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816 (1982).

 Certainly this is not a case where plain error was committed. Indeed, we doubt that there was any error whatsoever. Of course, as Sergeant Ruiz contends, "A person's failure to deny an accusation of wrongdoing concerning an offense for which at the time of the alleged failure the person was under official investigation ... does not support an inference of an admission of the truth of the accusation." Mil.R.Evid. 304(h)(3); *see also United States v. Cook*, 48 MJ 236 (1998) (holding military judge erred by admitting, over objection of the accused, evidence of an accused's silence in response to a friend's question as to whether he had committed rape).

Here, however, trial counsel "was not commenting on the accused's silence." As the court below noted, "the prosecutor was attacking the accused's version of the events in the manager's office," which portrayed him "as an innocent man ... wrongly accused ... by the lying AAFES store detective." In his testimony, appellant had "contradicted Ms. Rodarte's version of" the events and conversations at the store. Trial counsel "had a duty to ... point out the inconsistencies and" unbelievable nature of appellant's story. Like the court below, we also "suspect that the defense counsel and the experienced military judge did not intervene because they

recognized the prosecutor's actions for what they were—proper cross-examination." 50 MJ at 525. Trial counsel was not focusing on appellant's silence but instead was attacking the credibility of what appellant claimed he did say. This was perfectly appropriate cross-examination and argument.

### Conclusion

The decision of the United States Air Force Court of Criminal Appeals is affirmed.

GIERKE, Judge (concurring in part and in the result and dissenting in part):

To the extent that the lead opinion suggests that "an unfair prejudicial impact on the jury's deliberations" (54 MJ at 143) is an element of plain error, I disagree. Likewise, to the extent that the opinion suggests that reversal is mandatory if there is plain error, I disagree. To the extent that the opinion holds that our Court has discretion to decide whether relief is warranted even if it finds plain error, I agree. See United States v. Schlamer, 52 MJ 80, 86 (1999); United States v. Powell, 49 MJ 460, 464–65 (1998); United States v. Riley, 47 MJ 276, 281 (1997) (Gierke, J., concurring). Finally, to the extent that the lead opinion holds that appellant failed to carry his burden of persuading us that there was plain error, I agree.

CRAWFORD, Chief Judge (concurring in the result):

I agree with the majority and the court below that Ms. Rodarte's statement to appellant, "There seems to be some AAFES merchandise that has not been paid for," did not constitute an interrogation. Unlike the majority, I would accept the Government's proposal to revisit United States v. Quillen, 27 MJ 312 (CMA 1988).

In Quillen, the majority of the three-Judge Court focused on whether the store detective was "an instrument of the military," citing United States v. Penn, 18 USCMA 194, 199, 39 CMR 194, 199 (1969). Penn predated Mil.R.Evid. 305(b)(1). This Military Rule of Evidence defines the term "person subject to the code" as including "a person acting as a knowing agent of a military unit or of a person subject to the code." Accordingly, the analysis in Quillen should have turned to the question whether a store detective was "a knowing agent of a military unit or of a person subject to the code." It did not.

Trial counsel committed no error in his cross-examination of appellant, even if we were to view this cross-examination as an attack on appellant's silence. Appellant was not in custody and no Article 31(b), UCMJ, 10 USC § 831(b), warnings were necessary or given. Nothing in the Constitution prohibits use, for the purposes of impeachment, of an accused's silence prior to arrest or after arrest if no Miranda warnings are given. See Fletcher v. Weir, 455 U.S. 603, 606–07, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982); Jenkins v. Anderson, 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980); see also Brecht v. Abrahamson, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). As Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), has been interpreted and explained, comment on accused's silence constitutes error only when that accused remains silent in reliance on a government inducement, e.g., Miranda or Article 31(b) warnings. See Splunge v. Parke, 160 F.3d 369, 372–73 (7th Cir.1998); cert. denied, 528 U.S. 833, 120 S.Ct. 91, 145 L.Ed.2d 77 (1999); Pitts v. Anderson, 122 F.3d 275, 282 (5th Cir.1997); United States v. Balter, 91 F.3d 427, 439 (3d Cir.) cert. denied sub nom. DeJesus v. United States, 519 U.S. 1011, 117 S.Ct. 517, 136 L.Ed.2d 406 (1996); Vick v. Lockhart, 952 F.2d 999, 1002–03 (8th Cir.1991); United States v. Harrold, 796 F.2d 1275, 1279 (10th Cir.1986), cert. denied, 479 U.S. 1037, 107 S.Ct. 892, 93 L.Ed.2d 844 (1987). Cf. United States v. Cook, 48 MJ 236, 241 (1998)(Crawford, J., with whom Cox, S.J. joins, dissenting).

Once a defendant elects to testify, "his credibility may be impeached and his testimony assailed like that of any other witness." Brown v. United States, 356 U.S. 148, 154, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958); see generally Portuondo v. Agard, 529 U.S. 61, 120 S.Ct. 1119, 1125, 146 L.Ed.2d 47 (2000). "The safeguards against self-incrimination are for the benefit of those who do not wish to

become witnesses in their own behalf and not for those who do." *Raffel v. United States,* 271 U.S. 494, 499, 46 S.Ct. 566, 70 L.Ed. 1054 (1926); *see Jenkins v. Anderson, supra.* Use of silence for impeachment can add to the truth-finding objectives of a criminal hearing and promote the reliability of the entire process. *See Combs v. Coyle,* 205 F.3d 269, 285 (6th Cir.2000). Trial counsel's questioning of appellant in this case was proper cross-examination, as was trial counsel's argument, which properly ensued from this cross-examination.

SULLIVAN, Judge (dissenting):

I disagree with the majority's conclusion that Ms. Rodarte's statement to appellant, "There seems to be some AAFES merchandise that has not been paid for[,]" did not amount to an interrogation. *See Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); *United States v. Quillen,* 27 MJ 312 (CMA 1988).

Ms. Rodarte (the AAFES store detective) testified as follows at appellant's suppression hearing to questions by the defense:

> Trial Defense Counsel (DC): Are you expecting any type of response [to the statement, "There seems to be some AAFES merchandise that has not been paid for"]?
>
> A: *Well, we would hope to get a response.* A lot of times we don't.

* * *

> Q: And you also stated that when you made that statement, *you were hoping to get a response?*
>
> A: *Well, sure.*

R. 22, 29 (emphasis added).

Later the military judge asked:

> [T]rial counsel was posing a question and when he asked that question, you were pretty quick at stating that you didn't ask a question. *In your training, do they talk to you about whether you can ask questions or not of people?*
>
> A: *We don't interrogate people or ask people questions.*

> Q: And that's what they've told you not to do?
>
> A: Yes.

* * *

> Q: What in any of your training have you been told about asking questions or not? Have they told you at all about rights' advisements or any of those things, when you've had any training?
>
> A: *They've just told us we don't ask questions.*
>
> Q: *And did they tell you that so you don't have to get into rights' advisements or those things?*
>
> A: *I would presume so.*
>
> Q: Okay. But they have never really said that. They just said, "Don't ask questions."
>
> A: Right.

R. 33, 36 (emphasis added).

This Court has already decided that AAFES store detectives are persons subject to the code, thus requiring them to give Article 31 rights' warnings before they may "interrogate, or request any statement from, an accused or a person suspected of an offense." Article 31(b); *see United States v. Quillen, supra; see also United States v. Raymond,* 38 MJ 136, 144 (1993) (Sullivan, C.J., dissenting).

The outcome in *Quillen* is just as applicable to appellant's case. In *Quillen,* an AAFES store detective escorted the accused to the manager's office, where she then asked the accused "if he had a receipt for" items in plain view of the detective, as well as a few more particularized questions. In finding that the store detective was required to read the Article 31 warnings to the accused, this Court stated: "We are also persuaded that appellant perceived that Mrs. Holmes' inquiries involved more than casual conversation" and that it was "of great significance that questioning of appellant did not occur at the original stop but after he was escorted to the manager's office by store employees." 27 MJ at 315.

Ms. Rodarte's statement to appellant was not simply the equivalent of asking for a

receipt for merchandise. *Cf. United States v. Quillen, supra.* At the time he was taken into the Post Exchange (PX) office, appellant was not carrying any merchandise visible to others, so there would be no merchandise for which Ms. Rodarte could ask for a receipt. Ms. Rodarte's statement was designed to elicit an incriminating response from appellant. *See Rhode Island v. Innis,* 446 U.S. at 303 n. 9, 100 S.Ct. 1682 (noting that a conversation between two police officers in the presence of the accused did not amount to the functional equivalent of interrogation because, among other reasons, there was no evidence in the record to suggest that the conversation was "designed to elicit a response"); *see also* 2 Rudstein et al., *Criminal Constitutional Law* ¶ 4.02(3)(b)(iii)(1999)(noting various comments that have been held by courts to be the functional equivalent of interrogation).

It appears that Ms. Rodarte was trained not to ask questions in order to avoid implicating Article 31, but the trainers obviously did not understand that interrogation can mean more than explicit questioning. *See Rhode Island v. Innis,* 446 U.S. at 301, 100 S.Ct. 1682. The military judge, in making her ruling, likewise did not understand this broader definition of interrogation. *See Appellate Exhibit II* at 2 (Ruling on Defense Motion to Suppress Out-of-Court Statement of the Accused). Article 31 warnings cannot be avoided simply by transforming a question into a statement designed to elicit a confession. *See Rhode Island v. Innis,* 446 U.S. at 301, 100 S.Ct. 1682.

Any reasonable person in appellant's position would understand that Rodarte's statement was more than a casual remark or routine booking statement. *See id.; United States v. Quillen, supra* at 315. The practice that store detective Rodarte was trained to employ (making the statement, "There seems to be some AAFES merchandise that has not been paid for") was one which Ms. Rodarte knew was "reasonably likely to evoke an incriminating response" from appellant and therefore amounted to the functional equivalent of interrogation. *See* 446 U.S. at 302 n. 7, 100 S.Ct. 1682. During oral argument, the Government even conceded that had the

statement been made by a law enforcement officer, Article 31 would have been violated. *Oral Argument, United States v. Ruiz,* No. 99–0509 (December 10, 1999).

I further believe that allowing the prosecution to use appellant's incriminating statements was prejudicial to his defense. *See* Article 59(a), UCMJ, 10 USC § 859(a). Appellant's defense was that he was still in the PX when Ms. Rodarte stopped him and that he was going to the layaway counter with the merchandise which was not hidden in his jacket. R. 206–09. Appellant's admission to Ms. Rodarte—"You got me"—was in direct conflict with the story he told at trial. If the unwarned admission was suppressed, as it should have been, appellant's explanation may have been believed by the members. I would reverse under our case law.

EFFRON, Judge, with whom
SULLIVAN, Judge, joins (dissenting):

I agree with the majority that we should not revisit or disturb our holding in *United States v. Quillen,* 27 MJ 312 (1988). I also agree that we should assume for purposes of this appeal that under *Quillen,* the AAFES security personnel were required to advise appellant of his rights under Article 31, Uniform Code of Military Justice, 10 USC § 831. I do not agree with the majority, however, that the security personnel were not required to give Article 31 warnings because they did not interrogate appellant.

A. Interrogation of Appellant

1. *Background*

AAFES store detective Rodarte testified that she saw appellant place merchandise under his clothes and leave the post exchange. After calling for her supervisor as backup, they stopped appellant near the PX parking lot about 35 or 40 feet from the building. They identified themselves as store security personnel and invited appellant to come to the manager's office to talk. Appellant complied.

Ms. Rodarte testified that if appellant had not agreed to go with them to the office, she "would have followed him to his car, taken

down his [license] plate number, and called the base DODs [Department of Defense (DoD) police]." The AAFES personnel did not use handcuffs or any other kind of physical restraint, and they did not touch appellant in any manner. Ms. Rodarte stated that appellant "could get up and walk out at any time. I'm not gonna touch him." The AAFES personnel did not tell appellant that he was "under arrest," in custody, under detention, or that "in any way, shape, or form" he could not leave. Ms. Rodarte noted that, in the past, she had permitted people to "walk out on" her. In such circumstances, AAFES security personnel would simply follow the person, take down the license plate number, and call the DoD police.

Ms. Rodarte testified that after appellant accompanied her and her supervisor to the office, she made the following comment to appellant: "There seems to be some AAFES merchandise that has not been paid for." According to Ms. Rodarte, appellant responded, "You got me," and removed various items of merchandise from "under his clothing" and his pocket. DoD police arrived shortly thereafter. Appellant testified that he carried all the merchandise in open view and that nothing was hidden on his person. He denied making the incriminating statement.

During litigation on appellant's motion to suppress Ms. Rodarte's testimony regarding his incriminating statement, Ms. Rodarte testified that the store security personnel were trained not to initiate questions, but to make the precise statement at issue in this case: "There seems to be some AAFES merchandise that has not been paid for." When trial counsel asked her whether she "was expecting any type of response" to the statement at issue, Ms. Rodarte stated that she "hope[d] to get a response".

The record is devoid of any evidence that the AAFES security personnel were trained to make the statement at issue in order to facilitate arrest, custody, or detention, or that it served any purpose other than to provoke an incriminating response. Instead, the record makes clear that the store detectives were trained to make the statement specifically in hopes of provoking a verbal or non-verbal incriminating response. As Ms. Rodarte testified, the statement at issue was designed to give a suspect "a chance to voluntarily place it [the merchandise in question] on the desk if they want to."

The military judge ruled that evidence of appellant's statement was admissible. She concluded that the facts of this case were distinguishable from *Quillen*, that Rodarte was not a person subject to Article 31's warning requirements, and that her statement to appellant was not an interrogation. She expressed concern that if Rodarte's statement was viewed as an interrogation, "security personnel would be precluded from even informing a suspected shoplifter why they were being detained."

### 2. Discussion

As the majority opinion recognizes, "[I]nterrogation involves more than merely putting questions to an individual" and it includes " 'any formal or informal questioning in which an incriminating response is sought or is a reasonable consequence of such questioning.' Mil.R.Evid. 305(b)(2)." 54 MJ at 141. Indeed, commentators have observed that Mil.R.Evid. 305(b)(2) "was purposefully drafted in a broad fashion to thwart 'attempts to circumvent warnings requirements through subtle conversations.' " 54 MJ at 141, quoting S. Saltzburg, L. Schinasi, and D. Schlueter, Military Rules of Evidence Manual 225 (4th ed.1997). When government personnel who are required to give Article 31 warnings against self-incrimination make the type of comment that is attendant to events such as arrest or custody, rights' warnings are not required. *See Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

In the present case, if the store had a detention policy that required agents to make a statement reasonably designed to facilitate detention, no rights' warnings would have been required. The record in the present case, however, not only fails to demonstrate that there was any such policy, but also makes it quite clear that appellant was not detained and that the comment had no

purpose other than to hopefully provoke an incriminating response, rather than merely communicating information. *See United States v. Byers*, 26 MJ 132, 135 n. 2 (CMA 1988).

Under the principles of law set forth in the majority opinion, with which I agree, the record establishes both the subjective and the objective measures of an interrogation found in Mil.R.Evid. 305(b)(2). In making her comment to appellant, Ms. Rodarte sought to provoke an incriminating response and an incriminating response was a reasonable consequence of her comment.

### B. Prejudice

#### 1. *Background*

Appellant's incriminating statement was an important focal point of the prosecution's case. In trial counsel's brief opening statement to the members, there were two references to appellant's incriminating statement. During the prosecution's case-in-chief and rebuttal, Ms. Rodarte repeatedly testified about the statement. The military judge specifically addressed the incriminating statement in her instructions, charging the members that they could consider the statement on the issue of appellant's guilt if they were convinced beyond a reasonable doubt that, in fact, appellant had made the statement.

Trial counsel made appellant's incriminating statement the focal point of his closing argument. At the very outset of his argument to the members, trial counsel said:

"You got me." That was the culmination of the events on the 23rd of November 1996.

Trial counsel concluded his closing argument on the same note with a final reference to appellant's incriminating statement:

"You got me." Yes, yes, we do. We've got you, and we ask that you convict him.

Likewise, in trial counsel's argument in rebuttal, he twice more quoted appellant's incriminating statement.

#### 2. *Discussion*

The Government asks us to sustain the military judge's conclusion that even if the statement was inadmissible, any error in failing to provide rights' warnings was harmless. The Government notes that the DoD police, who arrived shortly after appellant's stop in response to the store detective's call, would have had probable cause to apprehend appellant and to search him incident to his apprehension. In the course of that process, the merchandise hidden on appellant's person would have been discovered. The Government contends that Ms. Rodarte's observations of appellant, coupled with the physical evidence of the merchandise that would have been found on his person during a search incident to apprehension, sealed appellant's doom, regardless of his incriminating statement.

The Government's position does not address the critical role that appellant's statement played in the case against him. Appellant disputed all testimony suggesting that he had surreptitiously concealed any merchandise in an attempt to steal it. The prosecution relied heavily on appellant's incriminating statement to undermine his testimony at trial. The prosecution made frequent and obvious use of the statement in its opening remarks, during its case-in-chief, during rebuttal on the merits, during its closing argument, and during the rebuttal argument. In this context, the error clearly was prejudicial.