# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

## UNITED STATES

**v.**

## Captain CHRISTOPHER S. LAMMENS
### United States Air Force

## ACM 38185 (f rev)

## 11 September 2014

Sentence adjudged 2 June 2012 by GCM convened at Moody Air Force Base, Georgia. Military Judge: W. Thomas Cumbie.

Approved Sentence: Dismissal and confinement for 15 years.

Appellate Counsel for the Appellant: Major Christopher D. James and Frank J. Spinner, Esquire.

Appellate Counsel for the United States: Lieutenant Colonel C. Taylor Smith; Major John M. Simms; Major Jason S. Osborne; and Gerald R. Bruce, Esquire.

Before

ALLRED, MITCHELL, WEBER
Appellate Military Judges

OPINION OF THE COURT
UPON FURTHER REVIEW

This opinion is subject to editorial correction before final release.

MITCHELL, Senior Judge:

A general court-martial composed of officer members convicted the appellant, contrary to his pleas, of carnal knowledge, rape, and indecent acts, in violation of Articles 120 and 134, UCMJ, 10 U.S.C. §§ 920, 934. The court sentenced him to a dismissal, confinement for 15 years, and forfeiture of all pay and allowances.

The appellant assigns as error: (1) the evidence is legally and factually insufficient; (2) the members were not properly instructed on the element of force in the

rape specification; (3) the evidence is legally and factually insufficient to show force; (4) the record of trial does not clearly indicate the convening authority reviewed all the materials in the appellant's clemency submission; (5) trial defense counsel were ineffective when they did not interview or call as a witness a nurse who performed a physical exam of the victim; and (6) the appellant's rights were materially prejudiced when the military judge failed to provide a limiting instruction after trial counsel's cross-examination elicited that the appellant invoked his right to counsel.

Because we found error in the original post-trial processing, we remanded the record of trial to correct the earlier oversight. *United States v. Lammens*, ACM 38185 (A.F. Ct. Crim. App. 7 March 2014) (unpub. op.). A new addendum to the staff judge advocate's recommendation was completed, and the convening authority considered all matters before taking action. The convening authority approved the findings and only so much of the sentence as provided for the dismissal and confinement for 15 years. He also waived the automatic forfeitures for the benefit of the appellant's dependent children. This new post-trial processing moots the appellant's earlier claim of error in the post-trial processing.

We now address the other issues raised.

*Background*

The appellant was 36 years old with over 18 years of service by the time of his court-martial. The appellant met HM over the Internet when he was stationed in San Antonio, Texas. The appellant moved into HM's house in 2005 and married her in January 2006. HM had a 14-year-old daughter, AW. Beginning in 2005, the appellant engaged in sexual activity with AW. Additional facts are addressed below.

*Legal and Factual Sufficiency*

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). "The test for legal sufficiency of the evidence is 'whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt.'" *United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002) (quoting *United States v. Turner*, 25 M.J. 324 (C.M.A. 1987)). "The test for factual sufficiency is whether, after weighing the evidence [] and making allowances for not having personally observed the witnesses, [we ourselves are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000) (quoting *Turner*, 25 M.J. at 325) (internal quotation marks omitted).

AW testified that she met the appellant when he was dating her mother. AW liked that they were dating because her mom, HM, was home more often and not

"out partying." In 2005, the appellant and HM decided he would move into her house. One day when AW did not have school and her mother was working, she went to the appellant's home to help him pack. While the appellant was alone with AW in his house he offered her shots of Apfelkorn liquor, which caused her to feel dizzy and lightheaded. The appellant then led her up to his bedroom. Once they were in the bedroom, he told her, "We can experiment with sex." She had slumped to floor by then, and he asked if she was okay. She nodded her head yes. He then began to kiss her and performed oral sex on her. During this time, he would ask her if she was okay, and she continued to shake her head yes. Afterward, he told her not to tell anyone because "he would get in a lot of trouble" and then he would not be with her mother. On a separate occasion at his house, they both undressed from the waist down and "grinded" on each other; however, there was no penetration because the appellant told her he had contracted an STD from her mother. He again told her not to tell anyone.

After he moved into HM's house, the appellant would go into AW's room at night and rub her back until she awoke. Then they would both undress and kiss. On 15 to 20 occasions, he also performed oral sex on her. He made AW feel happy and made her "feel like [they] were in love, that he loved [her] and that he really cared about [her]." The appellant and HM were married shortly before AW turned 15 years old.[1] Afterward, the nighttime visitations included sexual intercourse. Prior to the appellant's sexual intercourse with her, AW was a virgin.

Shortly after AW turned 16 years old, she and her mother moved with the appellant to Moody Air Force Base, Georgia. The appellant continued to have sexual intercourse with AW. The appellant and AW would tell her mother they were going to see a movie or get food, but instead, would go in his truck to someplace dark to engage in sexual activity. They also had sexual intercourse in an outbuilding that housed AW's ferrets.

AW told the appellant, "[she] didn't want to do it anymore, that [she] was going to try to have other boyfriends and stuff like that." When she had previously tried to have boyfriends, she would be "grounded" and would not be able to go anywhere. The appellant would make her feel bad by telling her that she did not love him anymore and the only reason he was with her mother was because of her. AW continued to engage in sexual activity with him "because he made [her] feel bad about it, not wanting to do it anymore." She felt "pressure" that he would leave her mother if she ceased sexual activity with him. She was concerned that then she "would stop getting stuff and [her] mom would probably be out more and she wouldn't be home anymore." In addition

---

[1] According to the transcript, AW testified that her birthday was 18 January 1981. If accurate, AW would have been in her mid-twenties throughout her entire relationship with the appellant. However, we are convinced beyond a reasonable doubt by her testimony, as well as the testimony of other witnesses, that AW was not born in 1981 but the year is a result of an error in either speech or transcription.

to the emotional manipulation, the appellant bought AW items such as "stick-on nails" and movies to entice AW to engage in sexual activity with him.

In addition to the oral intercourse and the vaginal intercourse, the appellant repeatedly asked AW to engage in anal intercourse, which occurred on one occasion. The appellant also videotaped and took pictures of them engaging in sexual activity. No videotapes, photographs, or computer data of sexual activity between the appellant and AW were entered into evidence.

During AW's senior year in high school, HM and the appellant separated and HM moved back to Texas to live with her parents. AW refused to return to Texas with her mother because she did not want to leave her friends during her senior year. While HM was in Texas, AW moved into the master bedroom with the appellant. AW and the appellant shared the master bedroom "as a couple." HM obtained a court order to have AW returned to her custody in Texas. Lieutenant (Lt) MT of the Lowndes County Sherriff's Office served the order on AW at the appellant's house in September 2008. AW did not want to comply with the order, but Lt MT explained she did not have a choice. He went with AW while she gathered her belongings. He saw that AW's personal belongings were in the master bedroom and master bathroom.

On many previous occasions, AW denied that there was anything inappropriate in her interactions with the appellant. AW admitted that she can be an effective liar in that she had convinced everyone, for about five years, that she did not have an inappropriate relationship with the appellant. AW had a medical examination in 2007 as part of a Child Protective Services investigation. She told the medical professional that she was a virgin, and the provider documented a normal looking hymen. AW also went to a mental health counselor while she was in Georgia. AW denied that she and the appellant had an inappropriate relationship. During the Air Force Office of Special Investigations (AFOSI) investigation of the appellant in 2008, AW told them she never had sex with the appellant and that her mother made up the allegations because they were divorcing and she wanted to ruin his career. AW also described her relationship with her mother as tumultuous but said that it had improved since she made the complaint against the appellant.

A high school friend of AW testified that the appellant admitted to her that he had sexual intercourse with AW. She also testified that the appellant contacted her, while she was in college, and told her there was an investigation and she should not talk to investigators or, if she did talk, she should deny specific events.

Chief Petty Officer (CPO) MC testified that she was good friends with HM. She would visit HM and AW when they lived in the San Antonio area with the appellant. She saw AW and the appellant "sitting or laying [sic] in ways that [she] was uncomfortable with" to include "spooning" and "one time they were sitting where [AW] had her legs

over his legs and he had his hand on her upper thigh and rubbing it." CPO MC attended a pool party at HM's parents' house. While there, the appellant took photos of AW in a bikini, had her pose like a model, and said AW "had a smoking-hot body and that if he were younger, then he would hit it." CPO MC understood "hit it" to be a euphemism for sexual intercourse. CPO MC addressed her concerns to HM but never reported any of her suspicions to law enforcement or child protective services.

The appellant's sister, KM, testified at the court-martial. In August 2007, she hosted a wedding for her sister. The appellant and AW were to attend the wedding and stay at KM's house. HM did not travel with them. The appellant mentioned several times to his sister that he and AW could sleep in the same bed while they were there. KM was not comfortable with that so she arranged two airbed mattresses, separated by a pool table, in her game room. KM realized that she needed an air pump, which was in the game room, for another mattress. The appellant and AW had retired to the game room for the evening about a half hour earlier. When KM went into the game room it was dark and silent, so she entered quietly so as not to awaken them. When she opened the door, her brother was lying at AW's side with the comforter over both of them. Her brother sprung up, and she could see that he did not have a shirt on; she did not see if he had any other clothes on as he was covered by the comforter. She was shocked and left the room. She heard the appellant fumbling against a weight machine to get some clothes on, and when he came out of the room, he tried to banter with her. But, she opened the door again and retrieved the air pump.

The next morning the appellant was in the kitchen when KM came in. He asked her what was wrong. She initially said, "Nothing." He persisted and then said, "Well, I -- I can't think of -- of anything that I've done that would make you upset" to which his sister responded, "Think harder." The appellant then retreated to the game room and was in there for about five minutes with AW. He returned and remarked that the only thing he could think of was that she walked in while he and AW were getting ready for bed. KM confirmed, "That's it." He then "got very angry very fast" and told his sister that he could not believe she was accusing him of something like that. The appellant later was yelling at his sister, calling her names, cursing her out and told her, "[AW]'s a confirmed virgin and we've taken her to the doctor to prove that she's a virgin, and when I get back, we're going to take her again." KM had never accused him of having intercourse with AW. The appellant and AW left her house shortly after that and did not attend his sister's wedding. AW testified that she and the appellant were in fact only talking when KM entered the room.

When the evidence is viewed in the light most favorable to the prosecution, we find that a reasonable fact finder could determine that all the elements were proven beyond a reasonable doubt. We conclude that the evidence is legally sufficient. We also conduct our own independent review of the evidence while making allowances for not having personally observed the witnesses. Contrary to the appellant's contention, the

conviction does not rest solely on the testimony of AW. AW's friend testified as to the appellant's confession to her. CPO MC testified as to appellant's aberrant behavior and comments. KM, the appellant's sister, testified to the appellant's exaggerated response to a non-accusation, which can be evidence of a consciousness of guilt.[2] We are convinced beyond a reasonable doubt that the appellant is guilty of the offenses.

*Parental Compulsion Instruction when the Victim is No Longer a "Minor"*

The appellant was convicted of raping AW in violation of Article 120, UCMJ. The time frame on this specification addressed the sexual intercourse after AW turned 16 years of age.[3] The military judge instructed the members that the second element was "that the sexual intercourse was done by force and without the consent of [AW]." He further detailed that "both force and lack of consent are necessary to this offense." He defined force to include both actual physical force and constructive force. He stated that constructive force applies "when the [appellant's] actions, words or conduct, coupled with the surrounding circumstances, create a reasonable belief in the victim's mind that death or physical injury would be inflicted on her or that resistance would be futile . . . ." The military judge further explained:

> Sexual activity between a stepparent and a minor child are not comparable to sexual activity between two adults. The youth and vulnerability of children, when coupled with a stepparent's position of authority, may create a situation in which explicit threats and displays of force are not necessary to overcome a child's resistance. On the other hand, not all children invariably accede to parental will. In deciding whether the victim did not resist because of constructive force in the form of parental compulsion, you must consider all of the facts and circumstances, including but not limited to the age of the child when the alleged sex abuse started, the child's ability to fully comprehend the nature of the acts involved, the child's knowledge of the accused's parental power, or any implicit or explicit threats of punishment or physical harm if the child does not obey the accused's commands. If [AW] did not resist due to the compulsion of parental command, constructive force has been established and the act of sexual intercourse was done by force and without consent.

---

[2] "The lady doth protest too much, methinks." WILLIAM SHAKESPEARE, HAMLET, act 2, sc. 2.
[3] Specification 1 alleged carnal knowledge of AW by the appellant the year before she turned 16 years of age. AW testified that the first incident of sexual intercourse occurred after she turned 15 years old.

The appellant did not object to this instruction at trial. Whether a military judge properly instructs the court members is a question of law we review de novo. *United States v. McDonald*, 57 M.J. 18, 20 (C.A.A.F. 2002). If there was no objection at trial we review for plain error, which requires (1) error, (2) that is plain or obvious, and (3) that it impacts a substantial right of the appellant. *See United States v. Kho*, 54 M.J. 63, 65 (C.A.A.F. 2000) (citing *United States v. Finster*, 51 M.J. 185, 187 (C.A.A.F. 1999)). The appellant bears the burden of persuading this court of the plain error, after which the burden shifts to the Government to show that the error is not prejudicial. *See United States v. Powell*, 49 M.J. 460, 464–65 (C.A.A.F. 1998).

"[C]ompulsion of a parental command is no different species from any other form of constructive force . . . ." *United States v. Palmer*, 33 M.J. 7, 10 (C.M.A. 1991). The instruction on parental compulsion as a form of constructive force is clearly authorized when the victim is a child under 16 years of age. *Id.* This court has previously found an appellant's conviction for raping his daughter when she was 16 to 18 years old legally and factually sufficient when the only force involved was the constructive force of parental compulsion. *United States v. Hansen*, 36 M.J. 599, 608 (A.F.C.M.R. 1992). Our superior court has upheld a military judge's decision to provide similar instruction on parental compulsion for a rape allegation when the victim was over 16 years of age. *United States v. Davis*, 52 M.J. 201, 203 (C.A.A.F. 1999).

> Constructive force, acceding to parental will, and tender years were presented as alternatives to actual force, not as an invitation to dispense with the necessity of finding the force element of both rape and forcible sodomy. . . . [T]he military judge's instructions did not mandate a finding of parental compulsion, but merely permitted the members to understand the implications of such conduct, were they to find it occurred, on the elements of force and consent. *Id.*

We conclude that the instruction is not barred by the victim turning 16 years of age and there was no error in the military judge providing the instruction.

*Legal and Factual Sufficiency of Force by Parental Compulsion*[4]

The tests for legal and factual sufficiency are discussed supra. The appellant challenges his conviction on the rape specification on the grounds that insufficient evidence was presented to demonstrate he used force. We agree that there was neither evidence of physical force nor any explicit threats of bodily harm. However, the appellant's sexual intercourse with AW after she turned 16 years old continued his

---

[4] The appellant included this as part of the first assignment of error. Because this issue solely involves the rape specification while the remainder of his first assignment of error is aimed at all the charges and specifications, we believe it is better examined as a separate assignment of error.

long-standing sexual abuse of his step-daughter. On one of the first occasions they were alone together, he plied her with alcohol in order to have her be less likely to resist his advances. He committed sexual assaults on her on a regular basis beginning when she was 14 years old, and her first sexual intercourse was with the appellant when she was 15 years old. Beginning around the time she turned 16 years old, AW attempted to cease having intercourse with the appellant, but the appellant, via his position as her step-father, used parental coercion to force AW to continue to have sex with him. When the evidence is viewed in the light most favorable to the prosecution, we find that a reasonable fact finder could determine that all the elements were proven beyond a reasonable doubt. We conclude that the evidence is legally sufficient. We also conduct our own independent review of the evidence while making allowances for not having personally observed the witnesses. We are convinced beyond a reasonable doubt that the appellant is guilty of the offense of raping his step-daughter by force and without consent.

*Ineffective Assistance of Counsel for Failure to Investigate*

The appellant claims his trial defense counsel were ineffective because they failed to interview a sexual assault nurse examiner (SANE), Major (Maj) FC, who performed an examination of AW in 2007 and concluded that she had a normal looking hymen. In her letter to the Georgia Department of Children and Family Services she wrote, "I have examined [AW] today and a vagina exam was done today. Her hymen is normal appearing. [AW] absolutely denied any sexually activity. She has stated she had a "v" (virginity) card." In a post-trial affidavit, Maj FC wrote that she was never interviewed about her examination of AW. Maj FC did not suspect any possibility of sexual assault. If called to testify, she would have explained that the hymen did not have any indicators of sexual intercourse and would have been able to show the members pictures of normal hymens vice those that show signs of disfiguration related to sexual intercourse.

Trial defense counsel also submitted affidavits. They were aware of Maj FC's report and initially believed this report to be highly probative. However, upon consultation with another SANE they were told that no qualified SANE would perform a physical exam as a virginity test, as a physically intact (normal) hymen and sexual intercourse were not mutually exclusive. They made a decision to have the letter from Maj FC admitted but decided not to call her as a witnesses. Maj FC had retired by the time of trial and although they had her contact information, they decided not to contact her as they did not want to alert the Government that it should have a SANE expert testify to rebut the letter.

Maj FC's letter was admitted into evidence at the court-martial. Subsequently, the Government called a pediatrician who testified that the letter was vague and did not explain whether the examination was only an external examination or also included an internal examination. She also testified that although there are findings that are indicative of penetration, she would not perform a physical exam to determine if someone was a

virgin as that it was not medically conclusive. She stated that an examination within a few days of the intercourse would be medically appropriate in order to determine if there was an infection and to collect evidence.

By the time of trial, trial defense counsel were appointed a physician as a confidential expert consultant. This expert consultant confirmed that a physical examination could not determine if an individual was a virgin. She had also worked with Maj FC and had a low opinion of her work and informed trial defense counsel that Maj FC had a poor reputation for thoroughness at the on-base clinic.

This court reviews claims of ineffective assistance of counsel de novo. *United States v. Mazza*, 67 M.J. 470, 474 (C.A.A.F. 2009). When reviewing such claims, we follow the two-part test outlined in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Under *Strickland*, the appellant has the burden of demonstrating: (1) a deficiency in counsel's performance that is "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;"[5] and (2) that the deficient performance prejudiced the defense through errors "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.*

The deficiency prong requires the appellant to show his defense counsel's performance "fell below an objective standard of reasonableness," according to the prevailing standards of the profession. *Id.* at 687–88. The prejudice prong requires the appellant to show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. In doing so, the appellant "must surmount a very high hurdle." *United States v. Perez*, 64 M.J. 239, 243 (C.A.A.F. 2006) (citations and internal quotation marks omitted). This is because counsel is presumed competent in the performance of their representational duties. *Anderson*, 55 M.J. at 201. Thus, judicial scrutiny of defense counsel's performance must be "highly deferential and should not be colored by the distorting effects of hindsight." *United States v. Alves*, 53 M.J. 286, 289 (C.A.A.F. 2000) (citing *United States v. Moulton*, 47 M.J. 227, 229 (C.A.A.F. 1997)).

To determine whether the presumption of competence has been overcome, our superior court has set forth a three-part test:

> 1. Are appellant's allegations true; if so, "is there a reasonable explanation for counsel's actions"?
>
> 2. If the allegations are true, did defense counsel's level of advocacy "fall measurably below the performance . . . [ordinarily expected] of fallible lawyers"?

---

[5] U.S. CONST. amend. VI.

3.  If defense counsel was ineffective, is there "a reasonable probability that, absent the errors," there would have been a different result?

*United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (alteration and omission in original) (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)).

"[T]he defense bears the burden of establishing the truth of the factual allegations that would provide the basis for finding deficient performance." *United States v. Tippit*, 65 M.J. 69, 76 (C.A.A.F. 2007).  When there is a factual dispute, appellate courts determine whether further fact-finding is required under *United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997).  If, however, the facts alleged by the defense would not result in relief under *Strickland*, the court may address the claim without the necessity of resolving the factual dispute.  *See Ginn*, 47 M.J. at 248.[6]  "'[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'"  *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (alteration in original) (quoting *Strickland*, 466 U.S. at 690–91).

There is no factual dispute that trial defense counsel did not interview Maj FC before trial.  Therefore, we can resolve this matter without ordering a fact-finding hearing.  *See Ginn*, 47 M.J. at 248.  Trial defense counsel made a strategic choice to have the evidence they sought—"the results of [Maj FC]'s examination"—entered into evidence without calling Maj FC as a witness.  The letter documenting her examination of AW was admitted into evidence.  This letter included both the results of the examination as well as AW's statements that she did not engage in sexual intercourse.  Trial defense counsel located Maj FC but decided not to contact her as they wanted to maximize the favorable evidence—her results—while minimizing the Government's rebuttal through better qualified expert consultants.  Trial defense counsel's strategy worked in that the letter was admitted into evidence and the Government called a local pediatrician as a rebuttal witnesses.  Trial defense counsel made a strategic choice not to call Maj FC after thoroughly investigating the facts and law to determine the relative weight of her examination.  Trial defense counsel were not ineffective in making this determination, especially in light of the fact that the results of her examination were admitted into evidence.  Trial defense counsel have a reasonable explanation for their actions—they wanted the report admitted but did not want a more thorough cross-examination of the person who wrote the report.  The report was admitted into evidence; therefore, there is no reasonable probability that even if trial defense counsel

---

[6] The Government moved to attach an affidavit from an obstetrician gynecologist and several scientific journals to prove that a normal looking hymen does not rule out vaginal intercourse, both consensual and non-consensual.  We denied the motion.  We remind counsel that while we have fact-finding powers, our authority is to "act as a factfinder in an appellate review capacity and not in the first instance as a trial court." *United States v. Ginn*, 47 M.J. 236, 242 (C.A.A.F. 1997).

had interviewed Maj FC that the results of the court-martial would have been different. We find that trial defense counsel were not ineffective and appellant has failed to meet his burden on this issue.

*Evidence of the Appellant Invoking his Right to Counsel*

The appellant alleges that trial counsel improperly admitted evidence that he invoked his right to counsel during an interview with AFOSI agents. We disagree.

The appellant testified at the court-martial. During direct examination, he described a point in his marriage to HM, when she was in Texas and he was in Georgia, that they were planning to divorce and he was talking to her parents about the logistics of transferring her household items to her. Her mother recommended that he and HM talk to each other and reconcile. He told her he could not talk to HM until she removed a restraining order. Shortly thereafter, the attorney he hired "to deal with the divorce and the allegations as well" informed him that HM had withdrawn the restraining order and terminated her divorce petition.

Shortly after trial counsel began his cross-examination of the appellant, the issue of the appellant making a statement to AFOSI agents arose.

Q. You didn't really make any statements prior to coming up here and taking the stand, right?

A. I spoke with [AF]OSI.

Q. About how long did that conversation last?

A. I can't remember the conversation. I remember multiple agents came in. Two agents came in at first, spoke with me. One agent asked me questions, one agent taking notes. They left the room repeated times, came back, and asked me a number of different questions.

Q. Did you make a written statement?

A. No, I did not.

Q. Do you recall why that interview ended?

A. The interview ended because I asked for a lawyer.

At that point, trial defense counsel requested an Article 39(a), UCMJ, 10 U.S.C. 839(a), session. During the Article 39(a), UCMJ, session, trial defense counsel expressed his concern that the cross-examination was not appropriate. Trial counsel explained that he believed that the interview ended because "[the appellant] was confronted with some evidence and that he said he didn't feel comfortable talking about it." Trial counsel stated that he did not intend to elicit that the appellant requested an attorney and had no more questions on that subject. Trial defense counsel asked the military judge for "just one instruction about how they can and can't use that" evidence. The military judge replied, "Absolutely. Remind me." Neither trial counsel nor trial defense counsel ever reminded the military judge, and no additional limiting instructions were provided. The appellant testified for about 45 more minutes. Trial counsel did not make any references to this statement.

The military judge provided both trial counsel and trial defense counsel with a copy of his proposed instructions. Before the military judge drafted his instructions, trial counsel made a reference to a request for some specific instructions. Trial counsel followed up by requesting the false exculpatory statement instruction. The military judge sustained the defense objection to that instruction. When the military judge asked, "[N]o objections or requests for additions?," trial defense counsel said, "Correct, sir." Again, after the military judge provided the instructions to the members in open court, he asked if counsel for either side had any objections; again trial defense counsel stated he had no objections.

We first examine if the appellant preserved, waived, or forfeited his objection and related request for an instruction. We find that he forfeited both issues, leading us to review for plain error. *See United States v. Brooks*, 64 M.J. 325, 328 (C.A.A.F. 2007) (citing Mil. R. Evid. 103(d)); *United States v. Taylor*, 41 M.J. 701, 703 (A.F. Ct. Crim. App. 1995) *aff'd,* 44 M.J. 475 (C.A.A.F. 1996). "Usually any objection to questions asked on cross-examination must be made at the time they are asked." *United States v. Ruiz*, 54 M.J. 138, 143 (C.A.A.F. 2000). In order to preserve an objection when the ruling is one admitting evidence, the objecting party must make "a timely objection or motion to strike . . . in the record, stating the specific ground of the objection, if the specific ground was not apparent from the context," however this does not preclude review for plain error that materially prejudices a substantial right. Mil. R. Evid. 103(a)(1). "A party is not necessarily required to refer to a specific rule by citation. A party *is* required to provide sufficient argument to make known to the military judge the basis of his objection and, where necessary to support an informed ruling, the theory behind the objection." *United States v. Datz*, 61 M.J. 37, 42 (C.A.A.F. 2005) (citing *United States v. Banker*,60 M.J. 216 (C.A.A.F. 2004)); *United States v. Brandell*, 35 M.J. 369, 372 (C.M.A.1992)). Here trial defense counsel explained the basis for his request for an Article 39(a), UCMJ, session but never said he objected. Instead trial defense counsel used language such as, "I don't think it's appropriate cross-examination"; and "I don't feel comfortable." Trial defense counsel also included the caveat, "It sounds like

he -- he invoked -- and I understand that if that's -- if that's all there is and we're going someplace else --." The overall context of the Article 39(a), UCMJ, session was that trial defense counsel had concerns about any additional testimony about his client invoking his right to counsel. We are not convinced in this case that the request for an Article 39(a), UCMJ, session was the functional equivalent of a timely objection. "Where an appellant has not preserved an objection to evidence by making a timely objection, that error will be forfeited in the absence of plain error." *Brooks*, 64 M.J. at 328.

Furthermore, trial defense counsel never renewed his request to have a curative instruction provided to the members. Trial defense counsel twice told the military judge he had no objections and did not request any additional instructions. In doing so, trial defense counsel affirmatively waived his request for a curative instruction. "The failure to object to an instruction or an omission in an instruction before the members close to deliberate constitutes waiver of the objection absent plain error." *Taylor*, 41 M.J. at 703.

"Our standard of review for determining whether there is plain error is de novo." *Brooks*, 64 M.J. at 328 (citing *United States v. Gudmundson*, 57 M.J. 493, 495 (C.A.A.F. 2002)). "To demonstrate that relief is warranted under the plain error doctrine, an appellant must show that: (1) there was error, (2) the error was plain or obvious, and (3) the error was materially prejudicial to his substantial rights." *Id.* at 328 (citing *United States v. Fletcher*, 62 M.J. 175, 179 (C.A.A.F. 2005)). "Whether there has been improper reference to an accused's invocation of his constitutional rights is a question of law that we review de novo." *United States v. Moran*, 65 M.J. 178, 181 (C.A.A.F. 2007) (citing *United States v. Alameda*, 57 M.J. 190, 198 (C.A.A.F. 2002)). "The law generally discourages trial counsel's presentation of testimony or argument mentioning an accused's invocation of his constitutional rights unless, for example, an accused invites such testimony or argument in rebuttal to his own case." *Moran*, 65 at 181. It is well-settled law that evidence that an appellant asserted his right to counsel during official questioning is not admissible. *United States v. Moore*, 1 M.J. 390, 391 (C.M.A. 1976); Mil. R. Evid. 301(f)(3). However, a federal constitutional error can be held harmless, if we determine it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24 (1967).

We conclude that it was error for trial counsel to admit into evidence that the appellant invoked his right to counsel in order to terminate his interview. We are not convinced that the error was plain or obvious, particularly since the appellant was the first to introduce evidence that he was represented by counsel in relation to his divorce from HM, a restraining order, and "the allegations." There is no bar on the appellant deciding to admit evidence that he was represented by counsel earlier in the proceedings; and it is not clear that once appellant has introduced that evidence that trial counsel is still foresworn from that evidence. However, even if the error was "plain and obvious," we affirmatively hold that under the totality of the circumstances in this case any error was

harmless beyond a reasonable doubt.  The appellant testified at length, and this was one brief reference in his testimony.  Trial counsel never mentioned this testimony in closing argument.  *Cf. Moran*, 65 M.J. at 182.  "[S]tatements made by witnesses concerning the invocation of an accused's rights must be reviewed closely.  This is especially so when such comments are reiterated by trial counsel and when the trial is before members rather than a military judge alone."  *Id.*  However, this one short answer was a miniscule part of the appellant's testimony.   Further, the evidence of the appellant's guilt was overwhelmingly demonstrated by admissible evidence as addressed above.  For all these reasons, we determine that any error in the appellant's unsolicited response that the interview was terminated because he asked for an attorney and the lack of any limiting instruction was harmless beyond a reasonable doubt.

## *Conclusion*

We find the approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of the appellant occurred.  Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c).  Accordingly, the approved findings and sentence are

AFFIRMED.

FOR THE COURT

LEAH M. CALAHAN
Deputy Clerk of the Court

ACM 38185 (f rev)